CONNECTICUT NATIONAL BANK *v.* ROBERT A. GIACOMI

CONNECTICUT NATIONAL BANK *v.*
JOSEPH J. SANTOPIETRO

CONNECTICUT NATIONAL BANK *v.*
JOSEPH SANTORO ET AL.

CONNECTICUT NATIONAL BANK *v.* JACK R. GIACOMI

CONNECTICUT NATIONAL BANK *v.*
JOHN J. DEPASTINO ET AL.

CONNECTICUT NATIONAL BANK *v.* ROBERT R. ROSA
(15089)

PETERS, C. J., and BORDEN, BERDON, NORCOTT and KATZ, Js.

Argued January 11—decision released May 30, 1995

*Darrell K. Fennell*, with whom, on the brief, were *Philip M. Chiappone, Michael Winger* and *Jeffrey A. Rinde*, for the appellant (plaintiff).

*James E. Hartley, Jr.*, with whom, on the brief, was *Robin L. Bialy*, for the appellees (defendant Robert A. Giacomi et al.).

*Richard P. Weinstein*, with whom, on the brief, was *Peter B. Rustin*, for the appellees (defendant Joseph Santoro et al.).

*Eileen McGann* filed a brief for the appellee (defendant Joseph J. Santopietro).

KATZ, J. The primary issue in this appeal is whether a person who "aids and abets" another person's fraudulent conduct in connection with a securities transaction has violated General Statutes (Rev. to 1993) § 36-472 of the Connecticut Uniform Securities Act (CUSA).[1] The plaintiff, Connecticut National Bank (CNB),[2] brought suit, as payee, against the defendants,[3] as makers of promissory notes that were payable on demand. The defendants, all among the group of investors in the now defunct Great Rings Limited Partner-

---

[1] General Statutes (Rev. to 1993) § 36-472 provides: "PROHIBITED ACTIVITIES RE THE OFFER, SALE OR PURCHASE OF ANY SECURITY. No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

In 1995, the entirety of CUSA was transferred from chapter 662 to chapter 672a and renumbered. Due to this transfer, the above provision is now codified in similar language at General Statutes § 36b-4. To prevent confusion we will refer to relevant provisions of CUSA according to their designations in effect during the period of time at issue in this case, but we will indicate their current designations and any amendments as needed.

[2] Although CNB now operates under the name Shawmut Bank, N.A., we refer to it under its previous name, which it used during the period of time at issue in this case.

[3] The defendants were Robert A. Giacomi, Jack R. Giacomi, former mayor of Waterbury Joseph J. Santopietro, John J. DePastino, Valerie DePastino, Joseph A. Santoro, Hope Santoro and Robert R. Rosa.

ship (Great Rings), did not deny that they had executed the notes or that demand had properly been made but raised, inter alia, the special defense under General Statutes (Rev. to 1993) § 36-498 (g) that the promissory notes are unenforceable as contracts in violation of CUSA.[4] After a trial to the bench, the trial court, *Blue, J.*, concluded that the aiding and abetting of another person's securities fraud forms an "independent" basis for the imposition of liability under CUSA. Applying that rationale, the trial court found that CNB had aided and abetted fraud in connection with the defendants' purchase of securities from Great Rings, and consequently determined that CNB's conduct was an affirmative defense to the defendants' liability on the notes under § 36-498 (g). CNB appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

We are unpersuaded that § 36-472 includes within its prohibitions the aiding and abetting of another's fraudulent conduct and, therefore, we reverse the trial court's judgment for the defendants. Because the trial court did not consider other possible defenses raised by the defendants, and the record contains no findings of fact in that regard, we remand the case to the trial court for further proceedings with respect to such defenses.

---

[4] General Statutes (Rev. to 1993) § 36-498 (g) provides: "No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any regulation or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any cause of action on the contract." This subsection is now codified in substantially similar language at General Statutes § 36b-29 (h).

Valerie DePastino did not assert any CUSA special defenses. Because the trial court treated her as having raised such a defense, however, our discussion regarding the other defendants' CUSA claims applies equally to her.

Resolving extensive and conflicting testimony, the trial court found the following facts that are relevant to this appeal. Great Rings was a real estate investment enterprise formed in 1988 under a certificate of limited partnership. The general partners at that time were John Woodhull, Charles Mantione and Leslie Cristini. The Great Rings partners initially intended to purchase four parcels of unimproved land on Great Rings Road in Newtown, upgrade their zoning, and prepare single-family home sites that would then be resold at a profit. At some point early in Great Rings' existence, Kenneth Zak, a former salesman with the "infamous" Colonial Realty Company, Inc. (Colonial), became associated with the enterprise as a salesman. Among the various general partners and salespeople associated with Great Rings during its existence, only Zak had any contact with CNB and the particular defendants in this case.

In order to raise money to finance the Great Rings development, Zak and the general partners planned that "investors were to borrow the entire purchase price of their shares ($50,000 each) from a bank. Their notes would be directly payable to the bank. The partnership would guarantee a return at 8 percent per annum to the investors, to offset the interest on the notes to the bank. It was contemplated that in two years there would be sufficient funds to pay off the principal. Thus . . . the partners would raise millions, and the investors would never pay a dime out of their own pockets." This scheme "contained a substantial Ponzi element from the very beginning" because the "only conceivable source" of the 8 percent per annum return to the investors before the raw acreage could be developed was the original contributions of the investors themselves.

Zak approached employees of CNB to provide the financing to investors. In 1989, Zak met with Neal Fitz-

patrick, then a senior vice president and regional manager of CNB, who "agreed that the bank would loan money to those investors that the bank deemed qualified." Fitzpatrick then contacted two other bank employees, Inta Ezerins in Hartford and James Truelove in Waterbury, who also agreed to provide financing. The trial court determined that "[i]t is clear from the evidence that these bankers reached a detailed agreement with Zak that each investor's loan was to be in the amount of $50,000 (the entire purchase price of a Great Rings share) and that, in return for the loan, each investor would sign a demand note to CNB in that amount, with an informal maturity date two years hence and with interest set at 1 percent over prime. These terms were tailored to fit the needs of the Great Rings partners with exactitude."

Great Rings retained Attorney D. Robert Morris of Pullman, Comley, Bradley and Reeves for its legal work, including the preparation of documentation such as the certificate of limited partnership, a private placement memorandum dated May 1, 1988, and filings with the Securities and Exchange Commission and other agencies. Because Great Rings intended to make its venture exempt from the registration requirements of the federal Securities Act of 1933, it wanted to show that the venture involved not more than thirty-five purchasers of securities. To ease the fulfillment of that requirement, Great Rings was able to exclude from the thirty-five person limit each "accredited investor," a person with "a net worth . . . exceeding $1,000,000 or with an income exceeding $200,000 a year in each of the two most recent years. 17 C.F.R. § 230.501 (a) (5) & (6)." Also, Great Rings had to show that non-accredited investors had "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment." 17 C.F.R. § 230.506 (b) (ii). The Great

Rings partners entered into an escrow agreement with People's Bank of Bridgeport (People's), which agreed to hold subscription funds until subscriptions for twenty units were accepted on the approval of attorney Morris. The agreement contemplated that People's would return all money directly to the investors if subscriptions for twenty units were not accepted by October 1, 1988.

The trial court also made extensive findings about how particular individuals helped to solicit investors and facilitate the sale of Great Rings units.[5] There were "four principal promoters" of Great Rings in Waterbury: (1) Kenneth Zak; (2) his brother, William Zak; (3) Francis Donnarumma, then the corporation counsel of the city of Waterbury; and (4) James Truelove, then the vice president in charge of the private banking division of CNB's Waterbury branch.[6] As the primary salesperson, Kenneth Zak used various misleading sales techniques, made misrepresentations and committed forgeries in offering and selling the Great Rings units to investors.[7] Specifically, as to True-

---

[5] Because the defendants in this case interacted with CNB through its Waterbury office, we need only focus on facts relating to those relationships. See generally *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 659 A.2d 172 (1995); *Connecticut National Bank* v. *Gerace*, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 90-00442832 (October 15, 1992).

[6] Although the trial court did not specifically define "promoter" in its memorandum of decision, it is clear that it used that term not to refer to those individuals who actually committed the deceptive or fraudulent acts, but only to designate those individuals who had actively helped facilitate the purchase of the Great Rings investment units. Thus, it is clear that the trial court did not find CNB, through Truelove or otherwise, to be a "primary" violator of CUSA, and the defendants do not dispute this finding on appeal.

[7] The trial court found that Kenneth Zak: (1) was not a registered broker-dealer even though he actively sold the securities; (2) distributed to investors a private placement memorandum that contained serious misrepresentations; (3) failed to update that memorandum when he became a general partner of Great Rings in 1988; (4) misrepresented to investors that they

love's participation, the trial court found that he "was involved in at least the general decision to use Donnarumma to target local officials" in Waterbury.[8] Further, it found that in providing financing to Great Rings investors, Truelove ignored internal bank guidelines "with wholesale abandon" and shared with Kenneth Zak some personal information about Donnarumma's finances.[9] The trial court determined that this financial information about Donnarumma "immeasurably assisted" the Zak brothers in perpetuating and concealing their fraudulent sales techniques and practices.

Regarding the sale of Great Rings units to the particular defendants in this case, the trial court painstakingly detailed the deceptive practices and misrepresentations of fact by the Zak brothers. This factual backdrop is largely undisputed. Additionally, the trial court made findings about CNB's involvement, primarily through Truelove, with the selling and financing of these defend-

---

did not need to be "accredited" to qualify for the investment; and (5) committed various acts of forgery in order to hide from regulators and investors the improprieties of the Great Rings partners.

[8] The trial court found that there is a May, 1989 memorandum in which Truelove states that Donnarumma " 'is an excellent referral source and key to our relationship with the City of Waterbury.' " Again, it appears that the trial court found this memorandum relevant to show Truelove's desire to provide financing to Great Rings investors.

[9] The trial court reached this conclusion based on the following syllogism. First, it found that the investor questionnaire that was supposed to have been completed by Donnarumma, who apparently was both an investor and a "promoter" of Great Rings, contained financial information that had not been entered by Donnarumma. The court attributed these forgeries to the Zak brothers, who themselves filled in Donnarumma's entire balance sheet and financial statement. Second, the court noted that these forged entries included accurate information in addition to wholly contrived figures. The court noted that this interspersion of accurate information made the questionnaire look more genuine and helped the Zaks conceal their fraud. Third, the court, based on Donnarumma's testimony, found that Donnarumma had given this personal financial information only to Truelove and Colonial. Because the trial court concluded that it made no sense for Kenneth Zak to have obtained this information from Colonial, the court concluded that Zak must have received it from Truelove.

ants' units in Great Rings. Joseph Santoro and John DePastino decided to purchase units from Kenneth Zak after he explained the benefits of Great Rings and the availability of financing through Truelove. They ultimately signed their promissory notes with CNB to finance their units after a five minute meeting with Truelove's assistant, "Freddie." Santoro testified that they signed blank notes after Freddie assured him that "Truelove was aware of all that was going on and that all that was needed was his signature." This apparently led Santoro to believe that CNB had preapproved of the Great Rings investment.[10]

Robert Rosa testified that he had learned about Great Rings through William Zak, with whom Rosa was familiar from prior investments in Colonial. William Zak told him that CNB had endorsed the investment and would provide financing for the venture. Although it is unclear whether Rosa provided CNB with a personal financial statement, Truelove gave Rosa a note to sign without discussing its terms. Prior to this transaction, Rosa had never met Truelove nor conducted business with CNB, but told Truelove that he was confident in the investment because CNB had fully endorsed it. Truelove responded to Rosa's comments without speaking, but only by putting the signed note away. Rosa understood Truelove's silence to mean that Truelove endorsed his investment in Great Rings.

Robert Giacomi learned of the investment opportunity in Great Rings on a boat trip with the Zak brothers and Donnarumma, who had invited Giacomi on the trip. After Donnarumma later urged him to invest and informed him that financing had been arranged, Giacomi, along with his brother, Jack Giacomi, then Mayor Santopietro and Joseph Tramuta, signed in the office

---

[10] Santoro also testified that he never heard from CNB about his loan until Kenneth Zak told him that it had been approved and brought him the check for endorsement.

of Mayor Santopietro subscription documents provided by William Zak. At the urging of William Zak, Robert Giacomi later contacted Truelove for financing. Truelove indicated his familiarity with Great Rings and "said that he had gone out to see the land in question, which he characterized as one of the most beautiful pieces of land in Connecticut. Truelove said that he was thinking of purchasing one of the lots, that Great Rings couldn't miss and that it was a 'homerun.' " Truelove also indicated that the loan would not be called for two years to tailor it to the expected period of time necessary for the general partners to sell the lots and give investors distributions. Robert Giacomi then signed the note, but submitted supporting loan application documents afterwards.

After learning of Great Rings on the boat trip, Jack Giacomi submitted a completed loan application to Truelove as instructed by Donnarumma. About a week later Jack Giacomi learned from Truelove, whom he had never met, that the loan had been approved, and Truelove stated to him of Kenneth Zak that "[t]his guy's been doing this for a long time. He's a pro. This is a pretty good project, and everyone should make some money." Jack Giacomi later signed a promissory note with Freddie.

Although neither Santopietro nor John DePastino had testified at trial, the trial court further found that Santopietro signed two $50,000 notes with CNB, only one of which is at issue in this case. Santopietro was solicited to invest in Great Rings by Donnarumma, and the trial court made no findings about the extent of the relationship between Santopietro and Truelove. As to DePastino, the trial court concluded that he had signed an otherwise blank promissory note with CNB and induced his wife Valerie to sign it as a comaker by falsely representing to her that it was merely a credit application. The trial court determined that the Zaks

thereafter forged the signature of DePastino's wife on the check for the loan proceeds to enable DePastino to invest in Great Rings.

Soon after escrow was broken in September, 1988, the investors' money quickly disappeared. The trial court rejected the notion that this resulted from a downturn in the real estate market, and instead concluded that "the investors' money was simply stolen." In 1991, CNB sued the defendants on their promissory notes and for unjust enrichment after these individuals failed to fulfill their financial obligations to CNB on the notes. The defendants, other than Valerie DePastino, answered CNB's complaint by denying liability and asserting identical special defenses and counterclaims.[11]

[11] Each defendant claimed the following special defenses to liability on the promissory notes: (1) that CNB acted as an agent of Great Rings, knew or should have known that the sales of interests in Great Rings violated CUSA and knew or should have known of the affirmative acts of fraud perpetrated by the general partners of Great Rings; (2) that CNB aided and abetted the fraud of the general partners; (3) that the promissory note was procured by fraud; (4) that CNB's conduct renders the promissory note rescindable; (5) that CNB's conduct violated General Statutes § 36-485 of CUSA; (6) that CNB's conduct violated General Statutes § 36-498 (b) of CUSA; (7) that CNB's claim is barred by General Statutes § 52-588; (8) that CNB's claim is void and unenforceable because CNB violated CUSA, and violated principles of fraud, misrepresentation, unconscionability and good faith and fair dealing; (9) that CNB's conduct renders the promissory note void and unenforceable under § 36-498; (10) that CNB's conduct renders its claim unenforceable under § 36-498 (g); (11) that CNB is liable under § 36-498 (c); and (12) that the defendant is entitled to attorney's fees under General Statutes § 42-150bb.

Each of these defendants also made the following counterclaim: (1) that CNB is liable for its "unfair and/or deceptive acts and/or practices" in violation of General Statutes § 42-110a et seq. (the Connecticut Unfair Trade Practices Act); (2) that CNB's conduct constituted a "course and pattern of unconscionable practices" in violation of General Statutes § 42a-2-302 and aided and abetted the general partners of Great Rings; and (3) that CNB breached its fiduciary duties and obligations to the defendant.

Subsequently, these defendants amended their answers, special defenses and counterclaims to include the following: (1) that CNB was negligent in allowing Great Rings to use it as an inducement; (2) that CNB is estopped from collecting on the note because it violated its internal credit policies

Valerie DePastino also denied liability and asserted special defenses based on the Uniform Commercial Code.[12] The actions were consolidated for trial.

In light of its factual findings, the trial court concluded that the defendants had satisfied their burden of proof on a combination of two of their affirmative defenses: (1) that CNB had "aided and abetted" the primary CUSA violations of the Great Rings partners; and (2) accordingly, that § 36-498 (g) precluded CNB from enforcing its promissory notes with the defendants. More specifically, the trial court determined that "aiding and abetting a securities fraud forms an independent basis for the imposition of liability under CUSA," and found that such liability constitutes a violation of CUSA within the meaning of § 36-498 (g). The trial court applied a three-pronged test to determine that the defendants had established CNB's liability as an aider and abettor in this case. It stated that "[i]n general . . . a party must prove three elements in order to impose aiding and abetting liability. '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.' [*International Investment Trust*] v. *Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980)."

In applying the test to the facts of the case, the trial court first noted that there had been various "primary

and guidelines; and (3) that CNB's conduct constitutes a violation of § 42-110a et seq.

[12] Valerie DePastino claimed the following special defenses: (1) that her husband, John DePastino, acted as the agent for CNB to secure her signature on a blank promissory note, and she did not authorize the insertion in the note of any specific terms; and (2) that the note was an "incomplete instrument" within the meaning of General Statutes § 42a-3-115 (1), the subsequent completion was "unauthorized" within the meaning of § 42a-3-115 (2), and she therefore is discharged from liability on the note under General Statutes § 42a-3-407.

violations'' of CUSA perpetrated by the Great Rings general partners, including the misrepresentations in the private placement memorandum and the forgeries of the investors' documentation. Second, the court concluded that CNB's reckless conduct, through Truelove, established the "scienter" element. In doing so, the trial court quoted with approval that " '[a] party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge. . . . Conversely, a party whose acts are routine and part of normal everyday business practices would need a higher degree of knowledge for liability as an aider and abettor to attach." *Camp* v. *Dema*, 948 F.2d 455, 459 (8th Cir. 1991). The court found that "[t]he banking activity established by the evidence in this case, however, cannot by even the most generous stretch of the imagination be described as normal everyday business practices. Rather, the banking practices here were atypical in the extreme. No one who has ever dealt with a bank in any loan transaction whatsoever can review the catalogue of CNB's acts in this case without shaking his head in wonder." Third, the trial court found that CNB had "substantially assisted" the primary violation by agreeing to loan money to the investors, promoting the Great Rings venture, and "directly assist[ing] its more fraudulent aspects by giving confidential financial information to the Zaks."[13] Additionally, the trial court rejected the defendants' counterclaims, from which the defendants do not appeal.

CNB principally claims on appeal that CUSA contains no implied, or "judge-made," doctrine of aiding and abetting liability to support the trial court's conclusion

---

[13] In applying this three-pronged standard, the trial court did not specifically mention or discuss the specific provision or provisions of CUSA to which, in its view, this standard applied.

that the defendants established their special defenses to the promissory notes under § 36-498 (g).[14] Further, it claims that even if such liability, or other secondary liability, exists under CUSA, the defendants nonetheless failed to prove their defenses to the notes under § 36-498 (g).[15]

Because the trial court did not expressly identify the provision in CUSA under which, in its view, CNB qualified as an "aider and abettor," the defendants posit various theories in support of the trial court's decision.[16] First, the defendants unanimously contend that the judgment of the trial court should be affirmed because it was based on a correct application of the three-pronged aider and abettor liability test. In doing so, some of the defendants argue that § 36-472 provides a source of aider and abettor liability sufficient to support their affirmative defenses under § 36-498 (g), and that the trial court's application of the three-pronged test accurately established that liability. Second, some of the defendants essentially argue that the trial court applied the three-pronged test not solely based on a theory of aider and abettor liability under § 36-472, but also based on one or more of the provisions of § 36-498. As an adjunct to this second argument, some of the defendants aver that even if § 36-472 does not provide for aider and abettor liability and the trial court did

[14] CNB argues that a finding of such liability is particularly inappropriate in its case because its promissory notes with the defendants, although contracts, were not "contracts in violation of" CUSA within the meaning of § 36-498 (g).

[15] CNB argues that: (1) "reckless" conduct does not satisfy the scienter prong of aider and abettor liability where it did not know of the fraud; (2) " 'recklessness' cannot be shown by describing 'atypical' or unusual behavior, when that behavior does not show reckless disregard of the fraud"; (3) "substantial assistance" is not shown by a "but for" causal connection to the buyer's purchase of the security; and (4) there was no "loss causation" connecting its conduct to the buyers' damages.

[16] Valerie DePastino did not file an appellate brief or participate at oral argument.

not, in fact, base its decision on the provisions of § 36-498, we should nonetheless affirm its decision because its factual findings support, or could have supported, CNB's liability as an aider and abettor under § 36-498.

We conclude that § 36-472 does not provide for any implied form of aider and abettor liability. Because we also conclude that the trial court did not find CNB liable under any of the other provisions of CUSA, including § 36-498, we reject the trial court's legal conclusion that the defendants have proved their affirmative defenses under § 36-498 (g).[17]

## I

We first consider whether § 36-472 includes within its proscriptions the aiding and abetting of another's securities violation. At the outset, we note that this court has never previously had occasion to construe the language of § 36-472, or consider the scope of its prohibitions. In determining whether § 36-472 provides for aider and abettor liability of any form, our primary inquiry must be whether § 36-472 "can fairly be interpreted to encompass such [secondary liability] in the first instance." *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 178, 510 A.2d 972 (1986). "We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. *State* v. *Kozlowski*, 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith*, 194 Conn. 52, 57, 480 A.2d 425 (1984). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its

---

[17] Because of our disposition of the case, we need not address CNB's other arguments.

relationship to existing legislation and common law principles governing the same general subject matter. *Dart & Bogue Co.* v. *Slosberg*, 202 Conn. 566, 572, 522 A.2d 763 (1987) . . . . *Texaco Refining & Marketing Co.* v. *Commissioner*, 202 Conn. 583, 589, 522 A.2d 771 (1987)." (Internal quotation marks omitted.) *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991); accord *Civardi* v. *Norwich*, 231 Conn. 287, 295, 649 A.2d 523 (1994).

We consider first the express language of the statute. Section 36-472 of CUSA provides: "No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." This language does not expressly include aiders and abettors. Consequently, we must determine whether the legislature nevertheless intended to include such persons.

In 1977, the Connecticut legislature formally adopted the Uniform Securities Act (Uniform Act). This included § 36-472, which corresponded to § 101 of the Uniform Act.[18] Public Acts 1977, No. 77-482. The legislative history of CUSA does not indicate that the legis-

---

[18] Section 101 of the Uniform Act provides: "[Sales and Purchases.] It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

lature intended to include aiders and abettors in § 36-472. On the contrary, the legislative history primarily concerns the desires of legislators to create new registration requirements.[19] In testifying to the banking committee on House Bill No. 7897, which became CUSA as enacted in Public Acts 1977, No. 77-482, the bank commissioner emphasized that the primary purpose behind the bill was to institute comprehensive registration requirements and thereby improve surveillance of securities trading. Conn. Joint Standing Committee Hearings, Banks, Pt. 1, 1977 Sess., pp. 175–76, remarks of Banking Commissioner Lawrence Connell. Representative William J. Scully, Jr., likewise made no mention of any implied provisions under the new legislation, but indicated only that the bill "will amend the Connecticut Securities Act by requiring certain types of securities to be registered with the State prior to sale to Connecticut investors." 20 H.R. Proc., Pt. 11, 1977 Sess., pp. 4517–18. Senator Joseph J. Dinielli reiterated this position in his remarks on the bill, stating that "[s]ecurities laws generally contain three basic elements—registration of brokers and salesmen, antifraud provisions and registration of securities and in Connecticut *the third is lacking and this [bill] would correct that lack.*" (Emphasis added.) 20 S. Proc., Pt. 8, 1977 Sess., p. 3208.

Although the legislative history reveals nothing regarding whether the legislature, when it adopted § 101 of the Uniform Act, intended to include aiders and abettors, we may be assisted in ascertaining that intent by looking to commentaries on the meaning of § 101. See *Elliot* v. *Sears, Roebuck & Co.,* 229 Conn. 500, 509, 642 A.2d 709 (1994); *Maloney* v. *Pac,* 183

_____

[19] We note that prior to the 1977 amendment, the antifraud provision in the Connecticut securities laws contained language similar to that which was adopted in 1977. Nonetheless, we have not uncovered any other legislative history that sheds light on the present issue.

Conn. 313, 326–27, 439 A.2d 349 (1981). Professor Louis Loss of Harvard Law School principally drafted the Uniform Act, which was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in August, 1956. L. Loss & E. Cowett, Blue Sky Laws (1958) p. v. Section 101 of the Uniform Act was modeled on rule 10b-5 of the Securities and Exchange Commission (SEC),[20] which, in turn, was modeled on § 17 (a) of the federal Securities Act of 1933.[21] L. Loss, Commentary on the Uniform Securities Act (1976) official comment to § 101, p. 6. Although modeled on § 17 (a), rule 10b-5 was promulgated by the SEC pursuant to its authority under § 10 (b) of the Securities Exchange Act of 1934.[22]

---

[20] Rule 10b-5 of the SEC provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (1994).

[21] Section 17 (a) of the federal Securities Act of 1933 provides: "Use of interstate commerce for purpose of fraud or deceit

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q (a) (1988).

[22] Section 10 of the federal Securities Exchange Act of 1934 provides in relevant part: "It shall be unlawful for any person, directly or indirectly,

Because Professor Loss employed the language of rule 10b-5 in § 101 of the Uniform Act, it is instructive to consider the accepted interpretations of rule 10b-5 at that time. Put another way, it is likely that § 101 was meant to include aiders and abettors if rule 10b-5 had been interpreted, at that time, to include such persons. L. Loss, Commentary on the Uniform Securities Act, supra, draftsmen's commentary to § 101, p. 7. (rule 10b-5 is ''logical model for a uniform state fraud provision . . . because of the substantial body of judicial precedent which has been developed under the federal [law]''). This inquiry reveals that in 1956, when the Uniform Act was approved and first began to be adopted by states, no federal court had expressly recognized such implied liability. Indeed, it is well recognized that aider and abettor liability under rule 10b-5 was first formally recognized in the 1966 decision of *Brennan* v. *Midwestern United Life Ins. Co.*, 259 F. Sup. 673, 680–81 (N.D. Ind. 1966). Consequently, it is unlikely that Professor Loss, in modeling § 101 on the broad language of rule 10b-5, contemplated that the provision would encompass aiders and abettors. This indicates that § 101 of the Uniform Act, upon which the legislature based § 36-472, did not include aider and abettor liability, regardless of subsequent developments in the law of rule 10b-5.

Nonetheless, the defendants argue that the trial court correctly relied upon a line of rule 10b-5 cases to conclude that the legislature intended to include aiders and abettors within § 36-472. To be sure, beginning in 1966,

---

by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j (1988).

with *Brennan* v. *Midwestern United Life Ins. Co.*, supra, 259 F. Sup. 673, the federal courts began expressly to recognize implied aider and abettor liability under rule 10b-5. See generally D. Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution," 120 U. Pa. L. Rev. 597, 620–22 (1972) (discussing origins of aider and abettor liability under federal securities laws). The *Brennan* court, for example, wished to incorporate the principles of § 876 of the Restatement of Torts,[23] and stated that "[i]n the absence of a clear legislative expression to the contrary, the statute must be flexibly applied so as to implement its policies and purposes. In this regard, it cannot be said that civil liability for damages, so well established under the Securities Exchange Act of 1934, may never, under any circumstances be imposed upon persons who do no more than aid and abet a violation of Section 10 (b) and Rule 10b-5." *Brennan* v. *Midwestern United Life Ins. Co.*, supra, 680–81. Over time, it became "well established in [federal] civil securities litigation that liability can accrue for aiding and abetting— a concept that has its roots in the law of torts as well as criminal law—when there are shown (1) a securities law violation by a primary party, (2) scienter on the part of the aider and abettor, and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." (Internal quotation marks omit-

---

[23] Section 876 of the Restatement of Torts (1939) provides: "For harm resulting to a third person from the tortious conduct of another, a person is liable if he

"(a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

"(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

ted.) 9 L. Loss & J. Seligman, Securities Regulation (3d Ed. 1992) p. 4479; see, e.g., *Harmsen* v. *Smith,* 693 F.2d 932, 943 (9th Cir. 1982), cert. denied, 464 U.S. 822, 104 S. Ct. 89, 78 L. Ed. 2d 97 (1983); *International Investment Trust* v. *Cornfeld,* supra, 619 F.2d 922; *Woodward* v. *Metro Bank of Dallas,* 522 F.2d 84, 93 (5th Cir. 1975).

These subsequent cases construing rule 10b-5 clearly would be relevant if we were attempting to ascertain the known meaning of rule 10b-5 in 1977. As we discussed previously, however, especially in the absence of other indicators of legislative intent, we look instead to the meaning of the Uniform Act, which began to be adopted by states shortly after it was approved in 1956. Indeed, if § 101 of the Uniform Act were meant always to be interpreted by courts in light of the interpretations of rule 10b-5 in existence at the time of each particular state's enactment of § 101, then states that had adopted the Uniform Act prior to the *Brennan* line of cases would accord a meaning to the language of § 101 different than those states, such as Connecticut, that have adopted § 101 more recently. Such an outcome would undermine the uniformity among states that underlies the very existence of the Uniform Act. See L. Loss & E. Cowett, supra, p. 238 ("state administration will benefit from an act which is reasonably coordinated with the federal legislation, *as well as uniform from state to state*" [emphasis added]). Thus, these subsequent cases are of lesser value to our interpretation of § 36-472.[24] Additionally, we note that the United States Supreme Court recently held that § 10 (b) of the

---

[24] Therefore, we reject the dissent's view that the known interpretation of rule 10b-5 in 1977 should control our determination of legislative intent because the language of rule 10b-5 and § 36-472 is identical and because "it is more likely that the legislature intended § 36-472 to have the meaning that had been accorded the language of rule 10b-5 and § 10 (b) of the Securities Exchange Act of 1934 by all seven of the federal Circuit Courts of Appeals that had addressed the issue."

Securities Exchange Act of 1934, and rule 10b-5 do not provide for a private cause of action based on implied aider and abettor liability, thereby casting into doubt the validity of this line of cases. See *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994) (Central Bank).[25]

Moreover, our interpretation that § 36-472 does not include aiders and abettors makes sense in light of its relationship with the rest of CUSA and the common law. See *Lauer* v. *Zoning Commission*, supra, 220 Conn. 460. This interpretation respects the legislature's decision to enact express provisions for secondary forms of securities fraud liability. In contrast to § 36-472, § 36-498 (c) provides that "[e]very person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person *who materially aids* in the act or transaction constituting the violation and every broker-dealer or agent *who materially aids*

[25] "We reach the uncontroversial conclusion, accepted even by those courts recognizing a § 10 (b) aiding and abetting cause of action, that the text of the 1934 Act does not itself reach those who aid and abet a § 10 (b) violation. Unlike those courts, however, we think that conclusion resolves the case. It is inconsistent with settled methodology in § 10 (b) cases to extend liability beyond the scope of conduct prohibited by the statutory text. To be sure, aiding and abetting a wrongdoer ought to be actionable in certain instances. Cf. Restatement (Second) of Torts § 876 (b) (1977). The issue, however, is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute." *Central Bank,* supra, 511 U.S. 177. The United States Supreme Court's rejection, in *Central Bank*, of implied aider and abettor liability under § 10 (b) and rule 10b-5 is relevant to our present inquiry to the extent that § 101 of the Uniform Act was based on the understood scope of rule 10b-5 prior to the *Brennan* line of cases. The *Central Bank* decision suggests that, because the language of § 10 (b) never permitted rule 10b-5 to include aiding and abetting liability, Professor Loss would not have believed that use of rule 10b-5's language in § 101 would create such liability.

in the act or transaction constituting the violation are also liable jointly and severally with and to the same extent as such person . . . ." (Emphasis added.) The express provision for a form of aider and abettor liability in § 36-498 indicates that when the legislature intended to create aider and abettor liability, "it had little trouble doing so." See *Central Bank*, supra, 511 U.S. 181–82; see also L. Loss & E. Cowett, supra, pp. 135–36 ("It is axiomatic that the person actually making a rescindable sale—the seller in the common-law sense—is in every case liable to the buyer. But most of the [blue sky] statutes [of all states] go into considerable detail in enumerating other persons who are liable.").

It is noteworthy that the language of § 36-498 (c) is based on and parallels that of § 410 (b) of the Uniform Act, which is "a detailed specification of those prima facie liable under § 410 (b)" and is not found in the federal securities laws. L. Loss, Fundamentals of Securities Regulation (1983) p. 1013. Professor Loss has stated that the language of this subsection, like other provisions of § 410, was incorporated "in light of the experience under the state statutes and § 12" of the Securities Act of 1933. Id.

We also may find guidance in precedent from other states that have adopted these relevant provisions of the Uniform Act. See, e.g., *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 719, 652 A.2d 496 (1995) (looking to interpretations of other states regarding their analogous provisions of article 9 of the Uniform Commercial Code). Such courts have likewise looked to the provisions of § 410 (b), as enacted in those jurisdictions, as an express source of various forms of secondary liability, including aiding and abetting liability. The Supreme Court of Alabama has recognized that Alabama's version of § 410 (b) is "substantially different and . . . considerably broader than § 12 of the

Securities Act of 1933. Subsection (b) imposes liability on a group of participants in securities transactions beyond the seller." *Foster* v. *Jesup & Lamont Securities Co.*, 482 So. 2d 1201, 1207 (Ala. 1986). In *Foster*, the court emphasized the difference between the various forms of express secondary liability under Alabama's version of § 410 (b), identifying that the subsection independently extends liability to persons who " 'are included on the basis of what may be considered an express statutory aiding and abetting theory.' " Id., quoting J. Rediker, "Alabama's 'Blue Sky Law'—Its Dubious History and Its Current Renaissance," 23 Ala. L. Rev. 667, 714 (1971). Similarly, the Court of Appeals for the Eighth Circuit adopted the rationale of the *Foster* decision to conclude that Arkansas' version of § 410 (b) "expressly creates two types of secondary liability for securities fraud, control person liability and aiding and abetting liability." *Arthur Young & Co.* v. *Reves*, 937 F.2d 1310, 1325 (8th Cir. 1991), aff'd sub nom. *Reves* v. *Ernst & Young,* 507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Neither of these decisions considered a version of § 101, upon which § 36-472 is modeled, as a possible basis for aider and abettor liability. Cf. A. Bromberg & L. Lowenfels, "Aiding and Abetting Securities Fraud: A Critical Examination," 52 Alb. L. Rev. 637, 659–61 (1988) (discussing only provisions of § 410 of Uniform Act as basis for aiding and abetting liability under blue sky laws). We hesitate to recognize greater liability under CUSA than that provided under federal securities law at the time that the Uniform Act was drafted, especially where CUSA expressly delineates secondary forms of liability such as aider and abettor liability.

Moreover, we note that we have found only one precedent specifically considering whether § 101 of the Uniform Act, as adopted in other jurisdictions, provides for aider and abettor liability. In a recent, post-*Central Bank* decision of a federal District Court, the court first

acknowledged that *Central Bank* precluded the plaintiff's aider and abettor cause of action under federal securities law, and then recognized the authority of that federal precedent to conclude that "[b]ecause [the plaintiff] offers no legal basis for aiding and abetting liability under Colorado's securities law or for an alternative interpretation of Colorado's securities law, I similarly conclude that no aider and abettor liability exists under" Colorado securities law. *Broadview Financial, Inc.* v. *Entech Management Services Corp.*, 859 F. Sup. 444, 453 (D. Colo. 1994).[26]

In sum, we conclude that § 36-472 does not include implied aider and abettor liability. Nonetheless, the defendants contend that the judgment in their behalf should be sustained because their affirmative defense under § 36-498 (g) depends not on the existence of an affirmative private cause of action for aider and abettor liability under § 36-472, but on their ability to use aider and abettor liability only as a defense to liability on their promissory notes. Although we may agree with the defendants that their special defenses do not depend on the existence of a private cause of action for aider and abettor liability under § 36-472, this distinction does not benefit them in this case. We conclude that § 36-472 only prohibits individuals from personally committing the fraudulent acts listed thereunder and, accordingly, that aggrieved investors must rely on other sources to seek redress from third parties who may otherwise facilitate such "primary" violations. This conclusion harmonizes with the United States Supreme Court's recent rejection of aider and abettor liability under

---

[26] Although the District Court in *Broadview Financial, Inc.* v. *Entech Management Services Corp.*, supra, 859 F. Sup. 453, broadly concluded that "no aider and abettor liability exists" under Colorado securities law and it did not specifically mention Colorado's equivalent to § 36-472, the court's reference to *Central Bank*, in the context of the rest of the opinion, makes it clear that it was rejecting only implied aider and abettor liability under Colorado's equivalent to § 36-472.

§ 10 (b) and rule 10b-5. See *Central Bank*, supra, 511 U.S. 185; id., 1460 (Stevens, J., dissenting) (rationale of decision applies to circumstances beyond private actions).

Despite the defendants' contentions that such implied aider and abettor liability is necessary to effectuate the broad protective purposes underlying CUSA, we are confident that our interpretation of § 36-472 does not unduly limit the avenues of recourse available to aggrieved investors.[27] As described above, the provisions of § 36-498 set forth the various theories upon which buyers of securities such as the defendants may recover damages from culpable parties. This section expressly permits buyers to recover from secondary parties for misrepresentations in securities transactions. General Statutes (Rev. to 1993) § 36-498 (c). Further, our conclusion in this case does not affect the extent to which aggrieved parties may rely on common law actions such as fraud or misrepresentation, either affirmatively to collect damages or defensively to avoid liability. See General Statutes (Rev. to 1993) § 36-498 (i) ("rights and remedies [provided by Uniform Act] . . . in addition to any other rights or remedies that may exist at law or in equity"). Additionally, to the extent that § 876 of the Restatement (Second) of Torts provides for aider and abettor liability, an aggrieved party may have a tort cause of action.[28] Moreover, if the legis-

[27] We also emphasize that this decision will not excessively restrict the ability of the commissioner of banking to enforce CUSA. See, e.g., General Statutes (Rev. to 1993) § 36-496 (authorizing commissioner to grant injunction, restitution or other appropriate remedy for securities fraud); see also Regs., Conn. State Agencies §§ 36-500-484a through 36-500-484d (listing prohibited conduct of broker-dealers, agents and investment advisers).

[28] Unlike pre-*Central Bank* courts that had to find implied aider and abettor liability under rule 10b-5 in order to incorporate into federal securities law the tort principles of § 876 of the Restatement (Second); see, e.g., *Brennan* v. *Midwestern United Life Ins. Co.*, supra, 259 F. Sup. 680; we need not look to the language of § 36-472 for such liability. On the contrary, tort principles of aider and abettor liability already exist under state

lature decides specifically to proscribe in § 36-472 con-

common law. See *Slicer* v. *Quigley*, 180 Conn. 252, 259, 429 A.2d 855 (1980); *Carney* v. *DeWees*, 136 Conn. 256, 262, 70 A.2d 142 (1949); see also A. Bromberg & L. Lowenfels, supra, pp. 657–58 (discussing aiding and abetting liability under state common law). Thus, with a form of this liability already in existence in 1977, we cannot conclude, in the absence of a specific indication to the contrary, that the legislature intended to provide for a duplicative or additional form of such liability in § 36-472.

Nevertheless, the dissent argues, on the basis of our decision in *Fahy* v. *Fahy*, 227 Conn. 505, 513–14, 630 A.2d 1328 (1993), that our prior recognition of § 876 of the Restatement (Second) of Torts compels us, in order to maintain a "coherent and consistent" body of law, to read § 36-472 as including aiders and abettors. This reliance on *Fahy* is inappropriate, however, because that case involved a fundamentally different issue of adjudication. In that case, we determined, as a matter of statutory interpretation, that an amendment to the statute governing the modification of alimony or child support orders applied only to child support orders. *Fahy* v. *Fahy*, supra, 513; see Public Acts 1990, No. 90–213, § 46 ("[a]fter the date of judgment, modification *of any child support order issued before or after the effective date of this act* may be made upon a showing of such substantial change of circumstances, whether or not such change of circumstances was contemplated at the time of dissolution"). Despite this conclusion, we determined, as a matter of common law adjudication, that "it is appropriate to extend elimination of the noncontemplation of the circumstances requirement to alimony" orders. *Fahy* v. *Fahy*, supra, 516. Concluding that the same substantive principle should guide the modification of both alimony orders and support orders made sense in *Fahy* because "[a]limony and support have historically been treated . . . as entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) Id., 515. CUSA and general principles of tort law, on the other hand, have no such history of mutual dependence or interconnection such that today's decision will render our law "inconsistent."

Indeed, the dissent's view misconstrues the scope of the Uniform Act by suggesting that § 36-472 automatically includes all common law causes of action or forms of liability. As suggested by Professor Loss' commentary to § 101, the Uniform Act was drafted not to include or to preempt all state law on the subject, but to provide uniform securities legislation that complemented state remedies already available outside the specific context of securities law. L. Loss, Commentary on the Uniform Securities Act, supra, draftsmen's commentary to § 101, p. 6. Professor Loss illustrated this distinction in addressing why the Uniform Act did not need to provide for civil liability against buyers. "[T]here is no clear need to create [in the Uniform Act] any *civil liability* against buyers as distinct from sellers. Although the lower federal courts have uniformly implied a civil cause of

duct that assists another person's fraudulent securities practices, it is free to do so.[29]

## II

Because we reject the defendants' affirmative defenses to the extent that they are based on § 36-472, we must address the alternative arguments of some of the defendants that the trial court based, or could have based, its determination, either exclusively or partially, on the provisions of § 36-498. Essentially, some of the defendants first contend that the trial court's decision relied not only on its conclusion that CNB violated § 36-472, but also on its determination that CNB had violated one or more of the subsections of § 36-498. As a further alternative, some of the defendants seem to

action against fraudulent buyers under the SEC Rule [10b-5], the federal courts when applying federal law do not have at their disposal all of the common-law and equitable remedies of deceit and rescission which are available to the state courts without benefit of statute." (Emphasis in original.) Id., p. 8.

[29] The state already can criminally prosecute "willful" violations of § 36-472. General Statutes (Rev. to 1993) § 36-497. The dissent contends that, because General Statutes § 53a-8 makes criminally liable a person who aids and abets another's crime, including a criminal violation under § 36-497, we should interpret § 36-472 as also including aiders and abettors. In the dissent's view, "it is an anomaly that an aider and abettor could be convicted of a felony and imprisoned for his actions, yet could, notwithstanding the protections of CUSA, successfully bring an action against the victim of the fraud on a contract entered into as part of the fraudulent scheme. Where the underlying circumstances are so offensive as to warrant criminal culpability, we should read the protection from contract actions accorded the victim of fraud by § 36-498 (g) to apply." This view underestimates the extent of recourse available to aggrieved parties. We need not find aider and abettor liability in § 36-472 to avoid such an "anomaly" because such parties often may find relief through other means such as: (1) provisions of CUSA other than § 36-472; see, e.g., General Statutes § 36-498 (a) and (c); (2) common law remedies or defenses; see, e.g., footnote 28 of this opinion; or (3) other applicable statutes, including—as suggested by the facts of this particular case—the Connecticut Unfair Trade Practices Act (CUTPA); see *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 518–21, 646 A.2d 1289 (1994) (CUTPA applies to banks, but not to securities industry).

argue that even if the trial court did not actually base its decision on the provisions of § 36-498, this court may look to the factual findings of the trial court to conclude that the defendants have valid affirmative defenses based on CNB's violations of § 36-498. We are unpersuaded by all of these arguments.

Although the trial court did not expressly identify § 36-472 as the provision in CUSA under which, in its view, CNB qualified as an aider and abettor, we construe the trial court's decision as having relied on only an implied theory of aider and abettor liability under § 36-472. As we discussed previously, the language of § 36-472 parallels that of rule 10b-5, and the trial court analyzed the defendants' aider and abettor claims exclusively on the basis of federal precedents construing the scope of pre-*Central Bank* rule 10b-5 implied aider and abettor liability.[30] In contrast, the language of § 36-498 (a) is based on § 12 (2) of the Securities Exchange Act of 1934,[31] and § 36-498 (c) has no direct federal counterpart. See part I of this opinion.

[30] Further, in its rectification dated July 7, 1994, the trial court explained that "the statutory provision in question before me was Conn. Gen. Stat. § 36-472. . . . [T]he following rectification in no way changes the basis of my decision, as the evidence before me amply established the numerous [primary] violations of § 36-472 set forth in my opinion."

[31] Section 12 (2) of the Securities Exchange Act of 1934 provides: "Any person who . . . (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon,

Also, the trial court expressly stated that "I find the second and tenth special defenses—based on the aiding and abetting doctrine and Conn. Gen. Stat. § 36-498 (g)—of the defendants other than Valerie DePastino to be established." This is telling because the defendants had pleaded special defenses based on § 36-498 only in their sixth, ninth and eleventh special defenses. Further, although the trial court did refer to a 1993 amendment to § 36-498 (a) in its discussion, thereby suggesting that it may have analyzed CNB's liability under that provision, at no point did the court consider the express language of that subsection or attempt to apply precedent construing § 12 (2) of the Securities Exchange Act of 1934, which is the analogous federal statute. Thus, we must reject the defendants' claim that the trial court found CNB to be an aider and abettor based on sections of CUSA other than § 36-472, or the common law.

Additionally, some of the defendants seem to argue alternatively that the trial court did make findings based on violations of § 36-498 (a) or (c), sufficient to support its determination that CNB violated CUSA within the meaning of the affirmative defense under § 36-498 (g). We must reject this proposed alternative ground for affirmance of the trial court's decision. Although we do not dismiss the argument that, in a proper case, § 36-498 (a) or (c) might provide a sufficient legal basis for sustaining aider and abettor liability, the trial court did not articulate a factual basis sufficient for this court, sua sponte, to find CNB liable under either § 36-498 (a) or (c).[32] In doing so, we empha-

less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77*l* (1988).

[32] Because we reject the defendants' attempted reliance on § 36-498 (a) and (c), we need not discuss the exact parameters of the conduct forming the basis of liability under, and scope of persons included within, those provisions. The contours of these particular provisions, like § 36-472, have never

size that this court reviews claims based on the record presented by the parties. Practice Book § 4061. We do not act as a fact finder in order to consider claims not decided at the trial level because "[t]he resolution of conflicting factual claims falls within the province of the trial court. . . . *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 666, 594 A.2d 958 (1991)." (Internal quotation marks omitted.) *Rosenfield* v. *Metals Selling Corp.*, 229 Conn. 771, 788, 643 A.2d 1253 (1994).

## A

The defendants first claim that "§ 36-498 (a) echoes the language of § 12 of the Securities Act of 1933 . . . as well as § 10 (b) of the Securities Exchange Act of 1934 . . . . Cases construing § 12, and comparable provisions under the Uniform Securities Act, demonstrate both that [CNB] could be primarily liable under that section, and aiding and abetting liability is well recognized thereunder." General Statutes (Rev. to 1993) § 36-498 (a) provided in relevant part: "Any person who . . . (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income

been specifically addressed by this court. Rather, we focus only on those aspects of these provisions that fatally flaw the defendants' arguments and, therefore, are dispositive of their claims.

received on the security, upon the tender of the security, or for damages if he no longer owns the security." Under this plain language, a party may be liable only if that party is one who has "offered or sold" the security in question.

In 1993, however, the legislature amended § 36-498 (a) to extend liability, inter alia, to a party who "offers or sells *or materially assists any person who offers or sells* a security . . . ." (Emphasis added.) Public Acts 1993, No. 93-169. The trial court noted that this amendment did not affect its analysis of the case because "[No. 93-169 of the 1993 Public Acts] merely clarifies a liability that was, in fact, in existence long before CUSA was originally enacted in 1977." The defendants concur in this assessment, arguing that the amendment does not affect the validity of their affirmative defenses under § 36-498 (g) because the amendment clarified the existence of, rather than created, aider and abettor liability under CUSA. CNB asserts, on the contrary, that the amendment created aider and abettor liability and, therefore, that the defendants' pre-1993 promissory notes may not be avoided on the basis of § 36-498 (a).

Subsection (a) of § 36-498 does not provide us with a basis upon which to affirm the trial court's decision. Although both CNB and the defendants argue that the effect of the 1993 amendment is important to this case, we need not decide the amendment's effect because the defendants' claims must fail regardless of whether this subsection provided for aider and abettor liability prior to 1993. In particular, on the basis of the factual record now before us, we cannot determine whether CNB is liable on the basis of the provisions of § 36-498 (a), which might then provide an alternative basis for affirming the trial court's conclusion that CNB violated CUSA within the meaning of § 36-498 (g), because the trial court analyzed the case only under the three-pronged test previously utilized in rule 10b-5 cases and,

therefore, never made any factual findings concerning the defendants' knowledge of the misrepresentations or omissions. This gap in the record is fatal to the defendants' claim.

As described previously, § 36-498 (a) expressly provides that a person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact . . . *the buyer not knowing of the untruth or omission,*" is liable for damages. (Emphasis added.) Unlike § 36-472, this provision expressly requires a buyer to show no knowledge of the untruth or omission otherwise constituting the violation. See L. Loss, Commentary on the Uniform Securities Act, supra, draftsmen's commentary to § 410 (a), p. 146 (buyer must show that he did not know of untruth or omission). In this case, the trial court's inquiry focused almost exclusively on the conduct of CNB and the Great Rings general partners. The only discussion in the decision even somewhat related to the defendants' knowledge was within the section concerning the primary violation prong of the three-pronged test. The trial court stated that "there were significant misstatements in the [private placement memorandum] itself, notably its false statement that the general partners would not receive commissions and its equally false statement about the existing sales price of comparable lots in Newtown. These misstatements pale beside the fact that, at least as far as the evidence in this case reveals, the [private placement memorandum] simply was not given out to most investors in the first place. Thus, as far as most investors were concerned, the real problem was a complete omission to provide the necessary material facts in order to make the various statements made by the promoters not misleading."

We cannot conclude from this passage that the trial court found that the defendants, in fact, did not know of the misstatements or omissions in question. In reach-

ing this conclusion, we find it noteworthy that some of the defendants did not testify at trial. At least as to these defendants, the trial court necessarily would have had to infer from other evidence that they had no knowledge of the misstatements or omissions. There is no discussion of such inferences in the decision. Indeed, the trial court's use of the phrase "as far as most investors were concerned" suggests that it was not making findings about the actual knowledge of any particular defendant or all of the defendants, but was only illustrating the fraudulent nature of the primary violations.

Moreover, various other passages in the trial court's decision suggest that it did not consider the actual knowledge of the investors and that, had it undertaken such consideration, it might have concluded that the investors had some level of awareness of the misstatements or omissions in the Great Rings offering. For example, before describing the conduct of the Great Rings general partners and CNB, the trial court indicated that "some (but by no means all) of the investors are themselves convicted criminals, see *United States* v. *Santopietro*, 996 F.2d 17 (2d Cir. 1993) [cert. denied, 510 U.S. 1092, 114 S. Ct. 921, 127 L. Ed. 2d 215 (1994)], and acted out of a greed every bit as ravenous as that which possessed the promoters and the bank." Also, the trial court noted that it had "not overlooked the fact that the defendants (other than Valerie DePastino, who was simply duped), were sufficiently eager to make money that they neglected to make inquiries that, with hindsight, should have been made." We do not mean to suggest that we believe that these observations of the trial court are a sufficient basis upon which to conclude that the defendants did have "knowledge" within the meaning of § 36-498 (a), but only emphasize that the trial court did not find that the

defendants had no knowledge.[33] Absent these necessary findings, we cannot determine that CNB has violated § 36-498 (a) within the meaning of the affirmative defense under § 36-498 (g). Because the defendants' claims fail on this basis, we need not hypothesize about whether the trial court's use of the three-pronged test would otherwise be appropriate to decide a claim under § 36-498 (a).

B

Finally, some of the defendants contend that the trial court found, or could have found, that their affirmative defenses under § 36-498 (g) are supported by CNB's liability under § 36-498 (c). Section 36-498 (c) provides: "Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable." These defendants contend, as they did in their pleadings, trial memoranda and closing trial argument, that CNB's relationship to Great Rings and the investors made it liable for the fraud of the Great Rings partners under this subsection as a

---

[33] Because there is no indication that the trial court even considered the issue of the investors' knowledge of the misstatements or omissions, we need not discuss what showing is required to prove that a buyer was "not knowing" of the untruth or omission.

"control person," "person occupying a similar status or performing similar functions," or "agent" of Great Rings. The defendants aver that, consequently, the existence of such liability is sufficient to trigger the availability of the § 36-498 (g) affirmative defense to their contractual liability on the notes. We disagree.

This claim requires little discussion. Because § 36-498 (c) establishes liability for certain categories of parties, the burden is on the buyer to prove that the third party falls within one of these categories. In this case, the trial court made no factual findings concerning whether CNB, acting through Truelove or others, was a "control person," "person occupying a similar status or performing similar functions," or an "agent" of Great Rings within the meaning of the provision. Consequently, in the absence of these essential findings of fact, we are in no position to find, sua sponte, that CNB is liable under any one or all of these categories. See *Rosenfield* v. *Metals Selling Corp.*, supra, 229 Conn. 788.

In sum, we conclude that a person who aids and abets another person's fraudulent conduct in connection with a securities transaction has not violated § 36-472. The defendants' affirmative defenses to their promissory notes therefore fail to the extent that they are based on that section of CUSA. Further, we reject the defendants' claim that they established, as a matter of fact, the affirmative defenses based on CNB's violations of § 36-498 (a) or (c). Consequently, because we reject the basis of the trial court's conclusion that CNB violated CUSA within the meaning of § 36-498 (g), we remand the case to the trial court to consider the defendants' argument that § 36-498 (a) and (c) provide for a form of aider and abettor liability and to decide the merits of the defendants' other special defenses.[34]

---

[34] Because the trial court rejected the defendants' counterclaims and they did not cross appeal on this aspect of the trial court's decision, the remand

The judgments of the trial court are reversed and the case is remanded to that court with direction to conduct further proceedings in accordance with this opinion.

In this opinion PETERS, C. J., and BERDON and NORCOTT, Js., concurred.

BORDEN, J., dissenting. The majority concludes that General Statutes (Rev. to 1993) § 36-472 does not allow for implied aider and abettor liability. I conclude, however, that the legislature did intend that § 36-472 encompass aider and abettor liability. I therefore dissent.

I believe that the majority's analysis is flawed in three principal ways. First, the majority's reliance on the meaning ascribed to rule 10b-5 of the Securities and Exchange Commission (SEC) at the time the Uniform Securities Act (Uniform Act) was drafted is misplaced and is not persuasive evidence of the meaning accorded the language by our legislature when it enacted § 36-472 in 1977. I am convinced, moreover, that the language of rule 10b-5 at the time of our enactment of § 36-472 was understood to encompass aider and abettor liability. Second, I am persuaded that the common law tort principles recognizing liability of aiders and abettors, which provided the basis for the long line of cases under federal law that recognized such liability under rule 10b-5, and our statutory provision for criminal accessorial liability, inform our interpretation of § 36-472. Third, in light of this consistent common and statutory law and in the absence of any contrary interpretation by any other state's courts, the majority's concern regarding disparate interpretations of the Uniform Act is misplaced.

will only involve the trial court's consideration of the defendants' remaining special defenses.

## I

I agree with the majority that, because § 36-472 was modeled on § 101 of the Uniform Act, which, in turn, was modeled on rule 10b-5 of the SEC, the interpretation afforded the language of rule 10b-5 is relevant to understanding whether § 36-472 provides for aider and abettor liability. I think, however, that, in its search for the meaning of § 36-472, the majority's reliance on the interpretation accorded rule 10b-5 when the Uniform Act was drafted in 1956 is misplaced.

The majority concludes that because "the legislative history reveals nothing regarding whether the legislature, when it adopted § 101 of the Uniform Act, intended to include aiders and abettors," we should be guided by the meaning accorded the language by its drafter in 1956, Professor Louis Loss, which, the majority argues, would be the meaning accorded rule 10b-5 at that time. Implicit in this conclusion is the determination, with which I agree, that the judicial interpretation of rule 10b-5 informs our interpretation of § 36-472. I am convinced, however, that the intent of the legislature is best served by looking to the meaning accorded the language of rule 10b-5 at the time Connecticut adopted the Uniform Act, rather than at the time the Uniform Act was drafted.

I do not dispute that, in interpreting a provision based on a model or uniform act, it is appropriate to "look for guidance to commentaries on the draft act." *Elliot v. Sears, Roebuck & Co.*, 229 Conn. 500, 509, 642 A.2d 709 (1994). I find nothing in the commentary to the Uniform Act, however, that convinces me that its drafter intended § 101 to be accorded the meaning of Rule 10b-5 at the moment of its drafting, frozen in time and impervious to the continuing development of rule 10b-5 jurisprudence in the federal courts. The majority con-

cludes that because the drafter considered rule 10b-5 a "logical model for a uniform state fraud provision . . . because of the substantial body of judicial precedent which has been developed under the federal provisions"; L. Loss, Commentary on the Uniform Securities Act (1976) draftsmen's commentary to § 101, p. 7; it therefore follows that only the judicial precedent developed to that time informs the meaning of the analogous Uniform Act provision. I disagree with this reasoning, and I find greater guidance in the official comment to § 101, which states: "[S]ection 101 is substantially the Securities and Exchange Commission's Rule [10b-5] . . . ." L. Loss, supra, official comment to § 101, p. 6.

I am convinced that our legislature intended that § 36-472 encompass aider and abettor liability when it enacted the provision in 1977.[1] By the time the legislature enacted § 36-472, the federal courts had been, for at least eleven years, interpreting the identical language of rule 10b-5 to encompass liability for aiders and abettors. Moreover, the multitude of federal courts that had considered the issue, including seven Circuit Courts of Appeals, without exception had interpreted rule 10b-5 to encompass aider and abettor liability. See, e.g., *Hirsh* v. *du Pont*, 553 F.2d 750, 759 (2d Cir. 1977); *Woodward* v. *Metro Bank of Dallas*, 522 F.2d 84, 94 (5th Cir. 1975); *Kerbs* v. *Fall River Industries, Inc.*, 502 F.2d 731, 740 (10th Cir. 1974); *Securities & Exchange*

---

[1] I realize that the General Statutes contained a provision similar to § 36-472, which had been enacted in 1967. See General Statutes (Rev. to 1977) § 36-338. This provision was repealed in 1977 by the same act that codified § 36-472. Had the legislature simply retained § 36-338, analysis of the legislative history and circumstances surrounding its enactment would be relevant to this discussion. Because that provision was expressly repealed with the rest of the then existing Connecticut Securities Act at the same time the legislature adopted the Connecticut Uniform Securities Act (CUSA), however, only the legislative history and circumstances surrounding the enactment of CUSA, and specifically § 36-472, are at issue in this case.

*Commission* v. *Coffey*, 493 F.2d 1304, 1317 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S. Ct. 826, 42 L. Ed. 2d 837 (1975); *Landy* v. *Federal Deposit Ins. Corp.*, 486 F.2d 139, 161 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1979, 40 L. Ed. 2d 312 (1974); *Strong* v. *France*, 474 F.2d 747, 752 (9th Cir. 1973); *Brennan* v. *Midwestern United Life Ins. Co.*, 259 F. Sup. 673, 682 (N.D. Ind. 1966), aff'd, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S. Ct. 1122, 25 L. Ed. 2d 397 (1970); *Anderson* v. *Francis I. du Pont & Co.*, 291 F. Sup. 705, 709 (D. Minn. 1968); see also *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 191 n.7, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) (reserving issue).

I agree with the majority that the legislative history is silent on the issue of aider and abettor liability. In the absence of evidence to the contrary, when the legislature adopts language mirroring a federal statute or regulation, the intent of the legislature is ordinarily that such language be accorded its meaning as understood in the federal courts at the time the state provision is adopted.

The majority argues, however, that the intent of the legislature in enacting § 36-472 was to provide a narrower scope of liability than that which was provided by the federal courts to rule 10b-5 in 1977. I disagree that our legislative silence on the issue leads to the conclusion that the legislature intended the language of § 36-472 to mean something that no federal court had ever read the substantively identical language of rule 10b-5 to mean, simply because no court had yet had occasion to interpret the language prior to the time of the drafting of the Uniform Act. The majority's conclusion that rule 10b-5 did not encompass aider and abettor liability in 1956 confuses the fact that no court had yet addressed the issue with a conclusion that such liability did not exist. Such a conclusion is misguided,

for once the issue was placed before the federal courts, they uniformly concluded that rule 10b-5 did encompass aider and abettor liability.

I am also unconvinced that the United States Supreme Court's recent holding in *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994) (*Central Bank*), sheds light on whether § 36-472 encompasses aider and abettor liability. To the extent that our understanding of § 36-472 is informed by the federal courts' interpretation of rule 10b-5, I think the better view is that we can best discern the intent of our legislature in enacting § 36-472 by looking to the meaning generally accorded the language upon which it was based, namely, rule 10b-5, at the time of its enactment, not by looking at its current contemporary interpretation. There are no doubt instances where the legislature has adopted language mirroring a federal provision for which no definitive interpretation had been accorded. In such cases, resort to the understood meaning at the time of enactment of such a provision would be fruitless, and perhaps federal interpretation of the analogous federal provision subsequent to our legislature's enactment of our state provision would be useful in interpreting our law. That situation, however, is not presented in this case. In my view, it is more likely that the legislature intended § 36-472 to have the meaning that had been accorded the language of rule 10b-5 and § 10 (b) of the Securities Exchange Act of 1934, by all seven of the federal Circuit Courts of Appeals that had addressed the issue, rather than the interpretation that the Supreme Court accorded the provision seventeen years after our enactment, an interpretation, moreover, that reversed twenty-eight years of federal precedent.[2]

---

[2] Moreover, the court in *Central Bank* did not interpret rule 10b-5. The entire opinion is concerned with the meaning of § 10 (b) of the Securities Exchange Act of 1934. Rule 10b-5 had been promulgated by the SEC pur-

## II

Moreover, although we have looked to the commentary to uniform laws where they are helpful in interpreting analogous enactments of our legislature, in those cases we have also conducted an independent analysis of our law. See, e.g., *Elliot* v. *Sears, Roebuck & Co.*, supra, 229 Conn. 510–13; *Maloney* v. *Pac*, 183 Conn. 313, 325–26, 439 A.2d 349 (1981). Such an independent reading of § 36-472, apart from the meaning ascribed to rule 10b-5, leads me to conclude that § 36-472 includes liability for aiders and abettors of securities fraud. I reach this conclusion because, in light of our state's general tort principles and our criminal law, to read § 36-472 to preclude such liability would render it an anomaly, and there is no indication that the legislature so intended.

The fundamental tort principles that underlay the federal courts' long recognized implied liability for aiding and abetting securities fraud are well grounded in our state law. In what is considered to be the foundational case for aider and abettor liability under rule 10b-5, the United States District Court for the Northern District of Indiana looked to the Restatement of Torts for guidance as to the scope of liability under the rule. *Brennan* v. *Midwestern United Life Ins. Co.*, supra, 259 F. Sup. 680.

---

suant to its authority under § 10 (b) and, therefore, because of *Central Bank*'s holding that § 10 (b) did not encompass aider and abettor liability, a fortiori rule 10b-5 could not prohibit such conduct.

That does not mean, however, that rule 10b-5 was not intended to bring within its prohibition the aiding and abetting of securities fraud, and I do not read *Central Bank* to suggest that this was the case. Rather, I read *Central Bank*'s holding, at least so far as rule 10b-5 is concerned, to be that, to the extent that rule 10b-5 does sweep aiding and abetting securities fraud within its prohibitions, it goes beyond the authority granted to the SEC under § 10 (b), and, therefore, enforcement of such a prohibition pursuant the rule would be ultra vires. I am convinced, therefore, that *Central Bank* did not address the meaning of rule 10b-5, nor does it persuasively inform our reading of § 36-472.

Recognizing that "[a]ppropriate general principles of law should continue to guide the development of federal law remedies under Section 10 (b) and Rule 10b-5," the court in *Brennan* cited 4 Restatement, Torts § 876 (1939) for the proposition that "[f]or harm resulting to a third person from the tortious conduct of another, a person is liable if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." (Internal quotation marks omitted.) Id. "In the absence of a clear legislative expression to the contrary, the statute must be flexibly applied so as to implement its policies and purposes." Id., 680–81.

It is true that the United States Supreme Court has now concluded, to the contrary, that " '[t]he ascertainment of congressional intent with respect to the scope of the liability created by a particular section of the Securities Act must rest primarily on the language of that section.' " *Central Bank*, supra, 511 U.S. 175. We, however, are not so constrained. Although it is now "inconsistent with settled methodology in § 10 (b) cases to extend liability beyond the scope of conduct prohibited by the statutory text"; id., 177; it would be inconsistent with our state statutory interpretation methodology, tort principles and criminal law not to do so in this case.

We have frequently stated that in our search for the intent of the legislature, we will look to a statute's "relationship to existing legislation and common law principles governing the same general subject matter. *Dart & Bogue Co.* v. *Slosberg*, 202 Conn. 566, 572, 522 A.2d 763 (1987) . . . . *Texaco Refining & Marketing Co.* v. *Commissioner*, 202 Conn. 583, 589, 522 A.2d 771

(1987)." (Internal quotation marks omitted.) *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991). We do not view a statute in isolation, but in the context of a body of law with which it should be consistent.

We have long recognized the tort principle, embodied in 4 Restatement, Torts § 876 (1939), and 4 Restatement (Second), Torts § 876 (b) (1977), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person. See *Slicer* v. *Quigley*, 180 Conn. 252, 259, 429 A.2d 855 (1980); *Carney* v. *DeWees*, 136 Conn. 256, 262, 70 A.2d 142 (1949). I disagree with the majority's rejection of this fundamental element of tort liability. To the extent that it is simply to follow the lead of the federal courts, I do not see why we must follow a method of statutory interpretation more constrained than that which we have applied in the past, nor do I think the constraints on interpretation of federal statutes are applicable in this instance.

It is axiomatic that "[t]here is no federal general common law"; *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); and, therefore, courts are constrained from applying such principles when interpreting federal statutes. Such constraints, however, are inapplicable in the interpretation of state statutes, which fit within a system of law comprised of interconnected statutory and common law. "Just as the legislature is presumed to enact legislation that renders the body of the law coherent and consistent, rather than contradictory and inconsistent . . . courts must discharge their responsibility, in case-by-case adjudication, to assure that the body of the law—both common and statutory—remains coherent and consistent." (Citations omitted.) *Fahy* v. *Fahy*, 227 Conn. 505, 513-14, 630 A.2d 1328 (1993).

Not only is the majority's interpretation of § 36-472 unduly narrow in comparison with our common law tort principles, it also may provide for a narrower range of civil liability than criminal liability for violations of the section. Pursuant to General Statutes (Rev. to 1993) § 36-497, a wilful violation of § 36-472 carries potential criminal penalties of a fine of up to $10,000 or imprisonment for up to ten years, or both. General Statutes § 53a-8 (a) provides that a "person, acting with the mental state required for commission of an offense,[3] who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." A person, therefore, who wilfully aids and abets another in a violation of § 36-472 could in all likelihood be prosecuted pursuant to § 36-497 and § 53a-8. Yet, under the majority's analysis in this case, no defense to a contract action brought by the aider and abettor of fraudulent activity would arise under General Statutes (Rev. to 1993) § 36-498 (h).

In my view, it is an anomaly that an aider and abettor could be convicted of a felony and imprisoned for his actions, yet could, notwithstanding the protections of CUSA, successfully bring an action against the victim of the fraud on a contract entered into as part of the fraudulent scheme. Where the underlying circumstances are so offensive as to warrant criminal culpability, we should read the protection from contract actions accorded the victim of fraud by § 36-498 (h) to apply.

[3] General Statutes § 53a-24 defines the term offense to include "any crime or violation which constitutes a breach of *any law of this state* . . . for which a sentence to a term of imprisonment or to a fine, or both, may be imposed . . . ." (Emphasis added.)

The majority also relies on the fact that, unlike its federal counterpart, CUSA includes provisions for some forms of secondary liability. Specifically, the majority notes that § 36-498 (c) provides for liability for "[e]very person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction . . . ." Admittedly, this provision provides for secondary liability for a limited class of individuals, namely, control persons, employees and broker-dealers. There is nothing in the legislative history, however, to suggest that the statutory enumeration of secondary liability for these individuals was intended to preclude liability for aiders and abettors who are members of a broader class of persons. "It is true that, in interpreting statutes we have on occasion read specific statutory references to indicate a legislative intent to exclude, by implication, other related potential referents. . . . Furthermore, if in this case either the explicit language or the legislative history of [the section] had indicated such a legislative intent, we would be required to respect that implication, and we would be precluded from reaching a result by way of common law adjudication that was contrary to that intent. Neither the statutory language nor that legislative history, however, indicates such an intent." (Citation omitted.) *Fahy* v. *Fahy*, supra, 227 Conn. 513.

The majority also concludes that it is "confident that [its] interpretation of § 36-472 does not unduly limit the avenues of recourse available to aggrieved investors." I disagree. Common law fraud supplies a remedy when a person makes false statements, but, absent a request or an occasion or a circumstance that imposes a duty

to speak, ordinarily there is no remedy for fraud by failing to make material true statements. See *Duksa* v. *Middletown*, 173 Conn. 124, 127, 376 A.2d 1099 (1977); *Franchey* v. *Hannes*, 152 Conn. 372, 378, 207 A.2d 268 (1965); *Egan* v. *Hudson Nut Products, Inc.*, 142 Conn. 344, 347, 114 A.2d 213 (1955); *Ceferatti* v. *Boisvert*, 137 Conn. 280, 283, 77 A.2d 82 (1950). Section 36-498 (c) provides for secondary liability, but not for general aider and abettor liability. To the extent, therefore, that aider and abettor liability was intended by the legislature to be implicit in § 36-472, as I believe it was, the majority's analysis does "unduly limit the avenues of recourse available to aggrieved investors."

### III

The majority concludes that consideration of the meaning accorded rule 10b-5 when our legislature enacted our analogous provision "would undermine the uniformity among states that underlies the very existence of the Uniform Act." I agree that resort *solely* to the understood meaning of rule 10b-5 at the time each state enacted Uniform Act § 101 hypothetically, under some circumstances, could result in different interpretations being accorded the provision, depending on the date of enactment in each state. Absent, however, a clear indication that the drafters of the Uniform Act specifically considered and rejected the notion of aider and abettor liability, and absent other persuasive state authority construing the Uniform Act to preclude aider and abettor liability, such a hypothetical concern should not control our reading of § 36-472 to the exclusion of an inquiry regarding the meaning of § 36-472 within the scheme of our common and statutory law. Thus, given the scheme of aider and abettor liability in our common law and statutory criminal law, the same conclusion might well be reached had our legislature enacted the provision in 1956.

Moreover, reading § 36-472 to include aider and abettor liability would not put our law at odds with any other state that has enacted Uniform Act § 101. This novel issue of state law has not been decided by the courts of any other state subscribing to the Uniform Act.[4] It may come to pass that those states will look to their common law traditions and conclude, as I have, that the reasoning of the long line of cases that interpreted rule 10b-5 prior to *Central Bank* properly melds their common and statutory law by recognizing liability for aiders and abettors of securities fraud.

Accordingly, because I conclude that aider and abettor liability is implicit in § 36-472, I dissent. I would, therefore, reach the other issues[5] raised by the plaintiff in its appeal.

---

[4] In *Broadview Financial, Inc.* v. *Entech Management Services Corp.*, 859 F. Sup. 444, 453 (D. Colo. 1994), cited by the majority, the United States District Court for the District of Colorado dismissed an aiding and abetting claim that had been brought under both federal and Colorado securities law. After concluding that *Central Bank*, which had recently been decided, disposed of the federal claim, in light of the plaintiff's failure to provide a basis for imposing such liability in state law, the court summarily concluded that no aider and abettor liability existed under the Colorado act. With no analysis or even citation to any provision of the Colorado act, this case cannot be considered a definitive resolution as to whether the provision of the Colorado act that was based on Uniform Act § 101 creates liability for aiders and abettors of securities fraud.

[5] The plaintiff also raises the following issues, which are predicated on a determination that § 36-472 encompasses aider and abettor liability: (1) whether recklessness satisfies the scienter requirement for aider and abettor liability; (2) whether a finding of "atypical" conduct is sufficient to conclude that the plaintiff was reckless; (3) whether "substantial assistance" in the fraud is established by a finding that the conduct was a "but for" link in the defendants' decisions to purchase securities; and (4) whether the plaintiff could be held liable for aiding and abetting a securities fraud where the defendants' losses were not proximately related to the fraud allegedly aided and abetted.