24326

ATLANTA SKIN & CANCER CLINIC, P.C., Richard W. Bailey, Arlene Bailey, et al., Respondents/Appellants v. HALLMARK GENERAL PARTNERS, INC., Hallmark Capital Holding Corp., Hallmark Group Real Estate Services, Corp., Hallmark Real Estate Development, Inc., and First Federal Savings and Loan Association of South Carolina, of whom First Federal Savings and Loan Association of South Carolina is Appellant/Respondent.

(463 S.E. (2d) 600)

Supreme Court

*James H. Brailsford, III* and *Jacquelyn L. Bartley*, both of *Robinson, McFadden & Moore, P.C.*, Columbia, *for Appellant/Respondent.*

*William A. Jordan* and *Cecil Nelson*, both of *Nelson & Jordan; David H. Wilkins*, of *Wilkins & Madden*, Greenville; and *John M.S. Hoefer*, of *Willoughby, Hoefer & Simmons*, Columbia, *for Respondents/Appellants.*

Heard May 16, 1995.

Decided Oct. 16, 1995; Reh. Den. Nov. 22, 1995.

*Per Curiam:*

This case presents the novel question of the liability of a lending institution under the South Carolina Uniform Securi-

ties Act when it loans money to serve as capital for an investment promoted by the fraudulent acts of others. Respondents/Appellants (hereinafter "Investors") sued First Federal Savings & Loan Association of South Carolina (hereinafter "First Federal") and various other parties (hereinafter "Hallmark Defendants"), alleging that First Federal aided, abetted, and controlled the Hallmark Defendants in the commission of various state securities statute violations. Upon careful consideration of the facts in the case and the applicable law, we conclude that First Federal is not liable for Investors' losses.

## FACTS

This case arises out of defective investments in a limited partnership. "Plantation Place of Greenville, L.P." was involved with constructing and operating a personal care facility for the elderly who do not require nursing assistance. The Hallmark Defendants collectively served as promoter, developer, and general managing partner of Plantation Place, while the limited partners consisted of various other investors. First Federal was neither a limited nor a general partner. It participated in none of the day-to-day operations of the partnership and attended no partner meetings.

In order to offer these unregistered securities to potential investors, the Hallmark Defendants prepared a "Private Placement Memorandum" (P.P.M.). First Federal had no hand in the preparation of this document, nor did it urge any potential investors to purchase any limited partnership interests. In the P.P.M., the Hallmark Defendants made certain representations about the investment in Plantation Place, the risks involved, and other terms and conditions. The alleged fraud in this case arises out of representations made in this P.P.M.

According to the P.P.M., the project was to be capitalized as follows. Fifty (50) units of limited partnership interest were to be sold to investors for $10,000 per unit. In addition to this $500,000 in investors' equity, a loan was to be obtained in the amount of $1,450,000. The total cost of the project, excluding sales commissions and acquisition fees, was to be $1,825,000. The P.P.M. provided that this would be a "turnkey" cost. In other words, if the project cost more than the projected amount, any additional cost would be borne by the Hallmark

Defendants—not by Investors. The P.P.M. further provided that the building would consist of 20,210 square feet.

All of the representations made by the Hallmark Defendants in the P.P.M. were not honored, however. First Federal agreed to make the loan, but for only $1,350,000—$100,000 less than the amount represented by the Hallmark Defendants in the P.P.M. The final building was significantly larger than that proposed in the P.P.M., thereby adding to the cost. The Hallmark Defendants were insolvent and could not live up to their "turnkey" promise. Thus, Investors lost their investments. The entire project became defunct, and the builder foreclosed on its mechanic's lien, assuming the loan with First Federal.

At trial, Investors successfully argued that First Federal aided, abetted, and controlled the Hallmark Defendants in the breaking of these promises. The case was submitted to the jury on two theories of liability, both arising from the South Carolina Uniform Securities Act: an aiding and abetting theory and a control person theory. The jury found for Investors against the Hallmark Defendants in the amount of $500,000 actual damages and $2 million punitive damages. Against the Hallmark Defendants *and* First Federal, the jury awarded $500,000 actual damages and $3.6 million punitive damages.

First Federal moved for a J.N.O.V. on both theories submitted to the jury. The judge denied the motion as to the aiding and abetting theory, and First Federal appeals that denial and the punitive damages award.[1] The judge granted the motion as to the control person theory, however, holding that Investors had adduced no evidence that First Federal acted as a control person. Investors cross-appeal the granting of that motion.

## DISCUSSION

### I. *First Federal's Appeal*

In 1961, South Carolina adopted the Uniform Securities Act, which was derived in large part from the then-existing federal securities laws and state "blue sky" laws. The South

---

[1] Because of our holding in this case, we need not address the punitive damages issue.

Carolina Uniform Securities Act (hereinafter "Securities Act" or "Act")[2] created public enforcement provisions as well as private civil remedies which are compensatory in nature. The Act authorizes the state Securities Commissioner to enforce its provisions, while giving private plaintiffs a limited civil right of action for securities fraud.

The primary statute which creates a private right of action for securities fraud is S.C. Code Ann. § 35-1-1490 (1987). It states that "[a]ny person who . . . [o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact . . . [i]s liable to the person buying the security from him. . . ." Investors alleged that the Hallmark Defendants violated this statute by making untrue statements in the P.P.M.

The secondary statute is § 35-1-1500, and it provides for derivative, joint and several liability for another's violation of § 35-1-1490:

> Every person who directly or indirectly controls a seller liable under § 35-1-1490, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who *materially aids* in the sale, and every broker-dealer or agent who *materially aids* in the sale are also liable jointly and severally with and to the same extent as the seller. . . .

(Emphasis added.) Investors seek to hold First Federal liable under this statute.

First Federal argues that it did not violate § 35-1-1500, because it did not "materially aid" the Hallmark Defendants in their violations of § 35-1-1490. We agree. Under § 35-1-1500, only the following persons can be held liable for materially aiding: (1) a partner, officer, or director of a seller (or person occupying a similar status or performing similar functions), (2) an employee of a seller, (3) a broker-dealer, and (4) an agent. First Federal was neither (1) nor (2) in this case. As to (3), the statutory definition of "broker-dealer" expressly excludes banks. § 35-1-20(3). As to (4), the definition of "agent" is "any individual, other than a broker-dealer, who

---

[2] S.C. Code Ann. §§ 35-1-10 to -1590 (1987).

represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." § 35-1-20(2). The record reveals no evidence that First Federal ever assisted or attempted to assist in the sale of the limited partnership interests. Thus, First Federal was not an agent.

Having determined that First Federal did not violate § 35-1-1500, our inquiry next turns to whether South Carolina recognizes an implied cause of action for aiding and abetting a Securities Act violation. This issue arises from that portion of the judge's charge in which he defined "aiding and abetting" to the jury:

> [T]he [investors] must prove, one, the existence of a securities law violation by the primary party, as opposed to the aiding and abetting party; number two, knowledge of the violation on the part of the aider and abettor; and, number three, substantial assistance by the aider and abettor in the achievement of the primary violation.[3]

In giving this instruction, the judge borrowed the doctrine of aiding and abetting securities fraud from federal jurisprudence. See *Woodward v. Metro Bank of Dallas*, 522 F. (2d) 84 (5th Cir. 1975). Federal courts have implied aiding and abetting liability under the rule which creates a common law tort action for violations of certain statutes. Federal aiding and abetting liability has been derived from Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (1981) and its regulatory counterpart, Rule 10b-5, 17 C.F.R. § 240.10b-5 (1994).

South Carolina's equivalent to Section 10(b) and Rule 10b-5 is found in § 35-1-1210,[4] which makes fraud or deceit in offers,

---

[3] This charge was similar to a requested charge presented to the judge by First Federal.

[4] Section 35-1-1210 provides that:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
> (1) Employ any device, scheme or artifice to defraud;
> (2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

sales, or purchases "unlawful," but does not, by itself, create a private right of action. The issue before us, therefore, is whether we shall adopt an implied aiding and abetting cause of action based on a violation of § 35-1-1210 or instead restrict aiding and abetting recovery to that provided for in § 35-1-1500.

As a preliminary matter, we note that the United States Supreme Court has recently held that a private plaintiff may not maintain an aiding and abetting suit under Section 10(b) of the Securities Exchange Act of 1934. *Central Bank of Denver v. First Interstate Bank of Denver,* — U.S. —, 114 S.Ct. 1439, 128 L.Ed. (2d) 119 (1994). Although *Central Bank of Denver* casts a pall over the reasoning of the federal aiding and abetting cases, it does not end our inquiry. *Central Bank of Denver* construed a *federal* securities statute, and, as will be seen, the South Carolina Uniform Securities Act contains a twist not to be found in the federal statutory scheme. We must look, therefore, to the Act to determine whether our Legislature intended to create an implied aiding and abetting cause of action. *See Fairfield Ocean Ridge, Inc. v. Town of Edisto Beach,* 294 S.C. 475, 366 S.E. (2d) 15 (Ct. App. 1988) (reiterating courts' duty to determine legislative intent where possible).

Nothing in the Act suggests such an implication. Had the Legislature wished to create an aiding and abetting cause of action outside of § 35-1-1500, it could easily have done so. *See Central Bank of Denver, supra.* Indeed, the very existence of an express "materially aids" civil remedy in § 35-1-1500 implicitly undermines the notion of an implied cause of action, absent some contrary expression of legislative intent. *See Pennsylvania National Mutual Casualty Ins. Co. v. Parker,* 282 S.C. 546, 320 S.E. (2d) 458 (Ct. App. 1984) ("expressio unius est exclusio alterius"; rule that enumeration of particular things excludes idea of something else not mentioned).[5]

Moreover, § 35-1-1560 states that "[t]he rights and remedies provided by this Chapter are in addition to any other rights or

[5] The Supreme Court of Connecticut has recently declined to recognize an implied aiding and abetting cause of action under that state's version of the Uniform Securities Act. *Connecticut National Bank v. Giacomi,* 233 Conn. 304, 659 A. (2d) 1166 (1995). *"The express provision for a form of aider and abettor liability in [Connecticut's version of § 35-1-1500] indicates that when the legislature intended to create aider and abettor liability, 'it had little trouble doing so.'" Id.* 659 A. (2d) at 1176 (quoting *Central Bank of Denver,* — U.S. at —, 114 S.Ct. at 1452).

remedies that may exist at law or in equity, *but this chapter does not create any cause of action not specified in this section. . . ."* (Emphasis added.) Section 35-1-1560 is indicative of the Legislature's intention that the only private remedies for securities fraud *predicated on* the Act are those specifically created by the Act itself. Of course, other remedies at law and equity which are not predicated on the Act—such as common law fraud, for example—remain available, and they may be joined with a Securities Act cause of action. *Bradley v. Hullander,* 266 S.C. 188, 222 S.E. (2d) 283 (1976).[6]

The drafters of the Uniform Securities Act, commenting on § 35-1-1560, support this view:

> The mere presence of certain specific liability provisions in a statute is no assurance that other liabilities will not be implied by the courts under the doctrine which creates a common-law tort action for violation of certain criminal statutes. Notwithstanding the presence of several specific liability provisions in each of the several SEC statutes, the federal courts have implied a civil cause of action by a defrauded seller against a buyer under [federal Rule 10b-5]. The "but" clause in [§ 35-1-1560] *is designed to assure that no comparable development is based on violation of* [§ 35-1-1210].[7]

The drafters further state that § 35-1-1560 "provides that 'unlawful' conduct does not result in civil liability except as provided in [§§ 35-1-1490 & -1500]."[8]

---

[6] In *Bradley,* the Court held that "[w]e think that this provision indicates a clear intent on the part of the Legislature to provide that the civil remedies set forth in the Act are in addition to all other causes of action or remedies at law or in equity." 266 S.C. at 195, 222 S.E. (2d) at 287. This merely reiterates the first part of § 35-1-1560 which gives plaintiffs the right to allege a Securities Act violation *in addition to* common law fraud and other causes of action not predicated on the Act. We do not construe *Bradley* in such a way as to violate the language of the second part of § 35-1-1560 ("this chapter does not create any cause of action. . . .").

[7] Unif. Securities Act § 410, 7B U.L.A. 643 (1958) cmt. (h) (citations omitted) (emphasis added). We assume that, when it adopted the Act in 1961, the Legislature had before it the above-quoted drafters' comment. *See The Lite House, Inc. v. J.C. Roy Co., Inc.,* 309 S.C. 50, 419 S.E. (2d) 817 (Ct. App. 1992) (holding that where legislative intent is uncertain, the court may look for it beyond the borders of the act itself; as aids in interpreting an act, courts may consider reporter's notes).

[8] Unif. Securities Act § 101, 7B U.L.A. 516 (1958) cmt.

By enacting the Securities Act, the Legislature created provisions which proscribe certain conduct in securities transactions, while it also fashioned a set of specific and comprehensive remedies for violations of those provisions. Section 35-1-1560 has a twofold purpose: (1) to preserve intact existing remedies not predicated on the Act, *see Bradley, supra,* and (2) to preclude the creation of new, implied actions founded on the proscriptive provisions of the Act.[9] Certainly, one effect of § 35-1-1560 is to foreclose an implied aiding and abetting cause of action based on a violation of § 35-1-1210. Yet due in part to § 35-1-1500, a defrauded party is not without a remedy against one who materially aids another in the commission of securities fraud. We therefore do not imply a cause of action for aiding and abetting a Securities Act violation outside of the express remedy contained in § 35-1-1500.

Investors contend that because First Federal requested and received a charge on aiding and abetting, they are now barred from raising the issue on appeal. We disagree. Whether an implied aiding and abetting cause of action exists is a question of subject matter jurisdiction. "Subject matter jurisdiction of a court depends upon the authority granted to the court by the constitution and laws of the state." *Paschal v. Causey,* 309 S.C. 206, 209, 420 S.E. (2d) 863, 865 (Ct. App. 1992).[10] It is axiomatic that subject matter jurisdiction cannot be waived or conferred by consent. *Id.*

Investors further assert that the case was submitted to the jury under a theory of aiding and abetting *common law* fraud and breach of fiduciary duty, and that the judgment should be affirmed on that ground. We disagree. The record clearly reflects that the trial judge never charged the jury on either aiding and abetting common law fraud or aiding and abetting breach of fiduciary duty.

---

[9] *See* Martin C. McWilliams, Jr., *Thoughts on Borrowing Federal Securities Jurisprudence Under the Uniform Securities Act,* 38 S.C.L. Rev. 243 (1987) (arguing that the Legislature is the most appropriate entity to address the considerations of creating new causes of action under the securities laws).

[10] Subject matter jurisdiction "refers to court's power to hear and determine cases of the general class or category to which proceedings in question belong. . . ." Black's Law Dictionary 1425 (6th ed. 1990). The term "Subject Matter" is variously defined as "the right which one party claims as against the other, as the right to divorce; or ejectment; to recover money; to have foreclosure. . . . Nature of cause of action, and of relief sought." *Id.*

## II. *Investors' Appeal*

Investors argue that the evidence submitted to the jury established that First Federal was a "control person" under S.C. Code Ann. § 35-1-1500. The trial judge disagreed and granted First Federal's J.N.O.V. motion as to control person liability. Investors seek a reversal of that ruling.

In ruling on a motion for a J.N.O.V., the court must review the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Unlimited Services, Inc. v. Macklen Enterprises, Inc.*, 303 S.C. 384, 401 S.E. (2d) 153 (1991). Even under this standard, we agree with the trial judge that there was no evidence of control on the part of First Federal to affirm the jury's verdict on that ground.

Section 35-1-1500 provides, in pertinent part, that:

> Every person who directly or indirectly controls a seller liable under § 35-1-1490 . . . [is] also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. . . .

The only South Carolina case on control person liability under § 35-1-1500 is *McGaha v. Mosley*, 283 S.C. 268, 322 S.E. (2d) 461 (Ct. App. 1984). In that case, Whiteside—a company's sole incorporator, president, and fifty percent shareholder—was held to be a control person and was held liable to a defrauded buyer of the company's shares.

*McGaha* dealt with only one dimension of control, however, in that *McGaha* presented a much clearer case of control than does the case before us. To more fully explore this issue, therefore, we must look beyond South Carolina case law. Because the Act was modeled on its federal counterparts,[11] an examination of the federal law on control person liability will be helpful. Federal courts' interpretations of the corresponding federal securities laws, "although not binding, may be applied as guidance in interpretation." *Biales v. Young*, — S.C. —, —, 432 S.E. (2d) 482, 484 (1993).

---

[11] Securities Act of 1933, § 15, 15 U.S.C.A. § 77*o* (1981) and Securities Exchange Act of 1934, § 20(A), 15 U.S.C.A. § 78t(a) (1981).

The United States Securities and Exchange Commission (SEC) defines the term control to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1994).

*Metge v. Baehler*, 762 F. (2d) 621 (8th Cir. 1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed. (2d) 774 (1986), *and cert. denied,* 474 U.S. 1072, 106 S.Ct. 832, 88 L.Ed. (2d) 804 (1986), sets forth a two-part test to determine when control person liability attaches. The plaintiff must establish (1) that the lender actually participated in and exercised control over the operations of the borrower, and (2) that the lender possessed the power to control the specific transaction or activity upon which the primary violation is predicated. Good faith and lack of participation are affirmative defenses available to lenders. *Id.*

The plaintiffs in *Metge* alleged several instances of control by the bank. The bank held 17 to 18 percent of the borrower's stock (including the right to attend stockholder meetings, to vote its stock, and to receive stockholder communications). The bank influenced the management of the borrower's subsidiary. The bank had power over the borrower's policy regarding capital stock. Bank personnel attended a few of the borrower's board meetings. Finally, it arranged innovative refinancing for the borrower, thereby influencing the borrower's debt structure. Still, the court held that this evidence was not sufficient for control person liability to attach. *Id.* Although the evidence suggested at most the potential for control, there was no actual control by the bank in *Metge.*

Other federal courts have used the two-part *Metge* test. *E.g., Schlifke v. Seafirst Corp.*, 866 F. (2d) 935 (7th Cir. 1989). In *Schlifke*, the bank made extensive loans to the borrower; it imposed liens on the borrower's reserves of oil and gas; it directed the borrower to dispose of inventory, pursue assessments of limited partners, and sell assets of limited partnerships in order to meet its loan obligations; and the bank even assisted the borrower in finding other loans from other banks.

*Schlifke* held that this conduct did not rise to the level of control. "[T]he fact that the Bank extended a loan to a company to finance its investment programs and took measures to

secure its loans does not establish actual exercise of control." *Id.* at 949. The court held that there must be control at the time of the alleged violation and that "activities and events that occur later cannot support a claim of liability." *Id.* As to the second prong of *Metge*, the court held that the bank had no power to control the manner in which the allegedly fraudulent sales of securities were made. *Id.*

Other courts have adopted a more stringent test than *Metge.* In *Orloff v. Allman*, 819 F. (2d) 904 (9th Cir. 1987), the court held that for control person liability to attach, the defendant must have had (1) "actual power or influence over the alleged controlled peron," and (2) the defendant must have been a "culpable participant in the alleged illegal activity." *Id.* at 906.

Investors set forth several instances of First Federal's alleged control over the Hallmark Defendants in their commission of Securities Act violations. We shall individually analyze each allegation of control applying the case law set forth above. We need not adopt any one of the above federal cases as the test for control person liability in South Carolina. First Federal's actions in this case do not rise to the level of control under any of them.

1. *The Loan Amount.*

The P.P.M. provided that the General Partners "expect to obtain a $1,450,000 construction loan. . . . If the Partnership cannot obtain the Loan, the Partnership will be unable to develop the Property." The P.P.M. also represented that Investors' investments would be refunded to them in such an event. First Federal agreed to make a loan, but not the loan anticipated by the Hallmark Defendants. Based on an independent appraisal paid for by First Federal, it made a loan of $1,350,000. The Hallmark Defendants never refunded the investments.

Investors allege that First Federal's refusal to loan the full amount promised in the P.P.M. is an example of control, yet First Federal did not participate in drafting or distributing the P.P.M. Investors allege that First Federal controlled the Hallmark Defendants in the breaking of this promise, but the promise was made before First Federal ever possessed even the potential for control. *See Metge, supra.*

Investors further argue that by refusing to loan the entire amount, First Federal altered a material provision of the P.P.M. after the fact—after the P.P.M. was prepared and distributed to Investors. The case law suggests no requirement on the part of First Federal to make a loan in compliance with the P.P.M., especially where First Federal had no role in its preparation. *See Schlifke,* 866 F. (2d) at 949 ("activities and events that occur later cannot support a claim of liability").

### 2. *Seventy Percent of Sales Must Be to Doctors.*

First Federal drafted a commitment letter in which it stated that a condition of the loan would be that 70% of the sales of limited partnership interests must be made to local doctors. Investors argue that this letter is a sign of control. The loan agreement signed by the Hallmark Defendants, however, does not contain such a requirement. Even if this were a suggestion of actual control, which we believe it is not, there is no nexus between the 70% requirement and any fraudulent act. *See Metge, supra.*

### 3. *"Sham" Sales.*

Investors allege that the Hallmark Defendants engaged in "sham" sales of limited partnership interests by selling six units to Court Development, Inc., a corporation linked to the Hallmark Defendants. Investors contend that these sales were fraudulent, merely carried out in order to free up escrow funds for the benefit of the Hallmark Defendants.

Assuming for the sake of argument that this is true, there is no evidence that First Federal had any connection with this transaction other than serving as the escrow agent for the project. Investors argue that First Federal—acting as both escrow agent and lender—knew or should have known that the sales were a sham. We disagree. Yet even if First Federal did know the sham sales were taking place, there is no evidence whatsoever that First Federal directed that the sales be made. Thus, the alleged sham sales were not controlled by First Federal. *See Schlifke, supra.*

### 4. *The Increase in Size of the Building.*

Although the P.P.M. projected that the project would consist of 20,210 square feet, the actual size of the finished build-

ing was about 28,000 square feet. The cost increased correspondingly, and the project ceased being a "turnkey" project and instead became a "cost-plus" project whereby the increased cost was paid for out of the investors' equity. The Hallmark Defendants were insolvent and Investors lost their investments.

First Federal had the right, derived from the loan agreement, to approve changes in the construction plans. However, the right to approve suggests at most the potential for control. *See Metge, supra.* The record reveals no evidence that First Federal ever directed that the size of the building be increased. Therefore, First Federal did not exercise actual control over this facet of the project.

### 5. *The Timing of the Sales, etc.*

Investors allege that First Federal "told the Hallmark Defendants when it could sell units . . . how soon the units must be sold . . . when draws could be made and for what amounts." We recognize the fundamental need of a construction lender to ensure that the advancement of loan proceeds does not outrun construction progress. This practice protects the lending institution while helping to prevent the premature exhaustion of construction funds. As the record is devoid of evidence that these practices amounted to anything other than First Federal taking reasonable measures to secure its loan, *see Schlifke, supra,* it is clear that First Federal's actions in this case were not the kind of "control" contemplated by § 35-1-1500.

### CONCLUSION

We reverse the trial judge's denial of First Federal's J.N.O.V. motion as to the aiding and abetting cause of action. We affirm the judge's granting of First Federal's J.N.O.V. motion as to the control person cause of action. Accordingly, the judgment below is

Reversed in part; affirmed in part.