USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1519 GARY A. DINCO, ETC., ET AL., Plaintiffs, Appellees, v. DYLEX LIMITED, ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, Senior U.S. District Judge] __________________________ ____________________ Before Boudin, Circuit Judge, _____________ Cyr, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Paul S. Samson with whom Mark T. Vaughan, Riemer & Braunstein, _______________ ________________ ___________________ Steven J. Kantor and Doremus Associates were on briefs for appellants. ________________ __________________ Randall F. Cooper with whom Mary E. Maloney and Cooper, Deans & __________________ ________________ _______________ Cargill, P.A. were on brief for appellees. _____________ ____________________ April 25, 1997 ____________________ BOUDIN, Circuit Judge. Gary Dinco, Felix Weingart, Jr., _____________ and a holding company owned by Dinco and Weingart, (collectively, "plaintiffs") brought this diversity action against numerous defendants alleging various fraud and securities-law claims in connection with the plaintiffs' purchase of Manchester Manufacturing, Inc. ("MMI"). After a lengthy trial, the jury found for the plaintiffs on their New Hampshire "Blue Sky" and common law fraud claims against five defendants who now appeal. We vacate the judgment and remand for a new trial. I. We begin with a description of the background events, identifying disputed issues as allegations. On sufficiency- of-evidence claims, the plaintiffs are entitled to have us assume that the jury saw matters their way. Ansin v. River _____ _____ Oaks Furniture, Inc., 105 F.3d 745, 749 (1st Cir. 1997). For ____________________ other issues (e.g., whether an error was prejudicial), all of ____ the evidence may be pertinent. Davet v. Maccarone, 973 F.3d _____ _________ 22, 26 (1st Cir. 1992). At the outset, this case involved four corporate defendants: Sears, Roebuck & Co., a U.S. corporation; Dylex, Ltd. ("Dylex"), a Canadian corporation; Dylex (Nederland) B.V. ( Nederland ), a Netherlands corporation that is a wholly owned subsidiary of Dylex; and 293483 Ontario Ltd. ("Ontario"), a Canadian holding company owned and managed by -2- -2- the individual defendants, Kenneth Axelrod, Mac Gunner, and Harold Levy. Axelrod, Gunner and Levy also served as management employees for a Canadian division of Dylex known as Manchester Childrens Wear. In 1974, Sears, Dylex, and Ontario formed MMI as a Delaware corporation based in New Hampshire, primarily to make children's clothing. MMI's common stock was issued to Dylex (42%), Ontario (30%), and Sears (28%). Dylex transferred its shares in MMI to its subsidiary, Nederland, in 1978. By agreement among the shareholders, sale of the stock was restricted and directorships were apportioned.  The six members of MMI's board of directors at all pertinent times were Axelrod and Gunner (appointed by Ontario), Wilfred Posluns and Irving Posluns (appointed by Dylex), and Henry Schubert, Raymond Novotny, and Novotny's successor, Melville Hill (all appointed by Sears). Donald Williams, Dylex's chief financial officer and a director of Dylex and managing director of Nederland, attended most of MMI's board meetings. Axelrod and Gunner were elected annually as MMI's president and treasurer. At first, MMI successfully made clothing, primarily for Sears. During this early period, plaintiffs Dinco (hired in 1976) and Weingart (hired in 1977) served respectively as MMI's plant manager and comptroller. However, competition from Asian manufacturers increased; around 1980, Sears began -3- -3- to purchase apparel from overseas manufacturers and withdrew business from MMI.  The loss of Sears' business threatened MMI's existence. Dylex favored liquidation, but Sears did not want to lose its investment in the company and suggested that MMI's New Hampshire facility be used to store and distribute inventory imported by Sears. MMI thus changed direction and in 1982, Sears and MMI entered a distribution contract. At this time Dinco and Weingart continued to run MMI's daily operations. MMI's distribution business with Sears grew steadily through 1986, when it represented about 70 percent of MMI's gross income. In August 1986, Sears completed an internal review of its warehousing and distribution business; the report, made known publicly in March 1987, recommended downsizing these operations to reduce inventory costs. Sears began selling its ownership interests and, by December 1988, MMI was the only remaining provider in which Sears held an ownership interest. Around September 1987, the three Sears buying departments that used MMI s facility suggested that Sears store its inventory instead with a California firm. Sears' distribution department reported this plan to Novotny and Hill, who allegedly informed MMI's board of directors. In September or October 1987, the board decided to sell MMI. In October 1987, an acquaintance of Levy sought to purchase MMI -4- -4- but withdrew when Gunner told him that Sears would not provide a requested guarantee of minimum sales volume for three years. In January 1988, Gunner, Axelrod and Levy informed Dinco and Weingart that MMI was being offered for sale; Dinco and Weingart were allegedly told that the reason for the sale was that Sears had decided to divest itself of ownership in affiliated factories, but that Sears' business with MMI would continue as usual.1 In February 1988, Dinco and Weingart met with Gunner, Levy, Hill, and brokers hired by the MMI board of directors to sell MMI. Hill stated that Sears would not make any written guarantees of business, but said that, in his experience, "99.9% of the time when the ties are cut" in divestiture sales, business with Sears remained the same or increased.  Dinco and Weingart, concerned that MMI's sale might eliminate their jobs, formed a holding company to purchase MMI. At a meeting with Hill, Gunner, Levy and the brokers on May 14, 1988, Dinco and Weingart expressed interest in purchasing MMI; and Hill again said that based on his experience, MMI's business with Sears would be as good or  ____________________ 1Weingart testified that Levy had made these statements but that they were "confirmed" by Gunner and Axelrod, who were participating by conference call. Admittedly, the testimony is not perfectly clear and, at the time, Dinco and Weingart were being addressed as employees, not as prospective buyers. -5- -5- better after the sale. On May 19, Axelrod, Levy and Gunner allegedly said that they would support the efforts of Dinco and Weingart to buy MMI and confirmed that "Sears would be there in the future" and business "would be as usual." On June 3, 1988, Dinco and Weingart offered to purchase all of MMI's business assets and a portion of MMI's real estate for a total of $2,050,000. The offer was contingent upon a guarantee by Sears of $1.1 million in gross sales to MMI for one year after the sale. The offer was rejected, and Dinco and Weingart were told that MMI wanted to sell all of its real estate and that Sears would not provide any written guarantees of minimum business volume. A second and a third offer by Dinco and Weingart, each linked to a minimum volume of Sears business, were rejected over the next several months. In September 1988, Dinco and Weingart made a fourth offer to buy MMI, not contingent on any minimum volume guarantees. They obtained financing from several sources, some of it secured in reliance upon Hill's statement that he believed business with Sears would remain unchanged or improve. Finally, in late December 1988, the parties agreed that Dinco and Weingart would purchase MMI's real estate and outstanding stock for a total of $2,045,000. The deal closed that same month. -6- -6- Following the sale of MMI to Dinco and Weingart, Sears' business with MMI continued to decline. A year later, on December 24, 1989, Dinco and Weingart were informed that their distribution contract with Sears was terminated. Dinco and Weingart were unable to meet their debt service, and one of the mortgagees, the First New Hampshire Bank, foreclosed on MMI's real estate in November 1990. In December 1991, Dinco, Weingart and their holding company filed suit against Sears, Dylex, Nederland, Ontario, Axelrod, Gunner and Levy.2 In addition to federal securities-law claims, the plaintiffs alleged violation of the New Hampshire Uniform Securities Act (also known as the "Blue Sky" law), N.H. Rev. Stat. Ann. 421-B:3, and common law claims for fraud. Prior to trial, all of the federal claims were dismissed or withdrawn. Manchester Mfg. _________________ Acquisitions, Inc. v. Sears, Roebuck & Co., 802 F. Supp. 595 ___________________ ____________________ (D.N.H. 1992); 909 F. Supp. 47 (D.N.H. 1995). On the eve of trial, Sears settled with the plaintiffs for $750,000.  A 14-day jury trial began in October 1995. In November, the jury returned verdicts in favor of the plaintiffs against Dylex, Nederland, Ontario, Axelrod and Gunner, but not against Levy. Against the remaining five defendants, the jury awarded $2,385,000 on the statutory Blue Sky claim and  ____________________ 2Axelrod's estate was the named defendant because Axelrod died prior to trial. For simplicity, we will refer to the defendant simply as "Axelrod." -7- -7- $523,500 on the common law fraud claim. The court awarded attorneys' fees, costs, and prejudgment interest to the plaintiffs. The five defendants held liable now appeal on various grounds. -8- -8- II. We begin with the legal elements of the claims at issue and with attacks on the district court's jury instructions, for it is hard to discuss sufficiency of the evidence without legal benchmarks. And while there is not much doubt about most of the elements of common law fraud and New Hampshire's Blue Sky law--we describe both briefly--the vicarious liability rules attending such claims are very much in dispute. Pertinently, under New Hampshire law, common law fraud requires that the defendant fraudulently misrepresent a material fact and that the plaintiff justifiably rely upon the misrepresentation. Gray v. First NH Banks, 640 A.2d 276, ____ ______________ 279 (N.H. 1994). A Blue Sky claim is made out where, inter _____ alia, the defendant, "in connection with the offer, sale, or ____ purchase of any security, directly or indirectly" makes an untrue statement of material fact or omits to state a material fact "necessary . . . to make the statements made . . . not misleading." N.H. Rev. Stat. Ann. 421-B:3.3 The next link in the chain is vicarious liability. In this case Sears had settled for itself and its employee Hill, who had made the most blatantly misleading statements. Thus,  ____________________ 3New Hampshire's statute is a version (largely unmodified) of the Uniform Securities Act, also adopted in some form by thirty-seven other states. 1 Blue Sky L. Rep. (CCH) 5500, at 1503 (1995). Pertinent provisions of the statute are reprinted in an appendix to this opinion. -9- -9- to reach the remaining corporate and individual defendants, the plaintiffs relied heavily, although not exclusively, upon common-law theories that make one person liable for the acts of another: agency, partnership, and civil conspiracy. The district court obliged, instructing the jury as to each of these three theories and providing definitions. The three theories were actually four, because under the heading of agency the district court instructed separately as to apparent authority and as to liability for acts done within the scope of employment. The plaintiffs' counsel began his closing argument by laying stress on such theories and returned to them throughout in discussing the evidence. The defendants' first argument on appeal is that "vicarious liability" is not a permissible theory under the New Hampshire Blue Sky statute in light of Central Bank of _______________ Denver, N.A. v. First Interstate Bank of Denver, N.A., 114 S. ____________ _____________________________________ Ct. 1439 (1994). The phrase "vicarious liability" is something of a trap where used promiscuously to embrace markedly different theories of third-party liability, such as agency, partnership and civil conspiracy. Central Bank _____________ involved none of these concepts, but rather rejected "aiding and abetting" liability under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. 78j. Although New Hampshire's Blue Sky law is to be construed in conjunction with "the related federal regulation," N.H. -10- -10- Rev. Stat. Ann. 421-B:32, the notion that all vicarious liability is barred under the state statute is fanciful. The statute in detail specifies that third-party liability may be based upon "control," "aiding," partnership, and other particular grounds. Id. 421-B:25(III). At the same time, ___ reasonable lack of knowledge is an affirmative defense against these forms of vicarious liability. Id. 421- ___ B:25(IV). Curiously, the district court made no reference to these statutory concepts in its instructions. Thus, the defendants' general proposition is wrong: vicarious liability--of several types--is provided for by the statute itself. What is more, the defendants' broad assertion was not preserved by objection after the judge instructed the jury, as Fed. R. Civ. P. 51 requires, and is therefore lost absent plain error. The defendants say that they raised the objection earlier in motion papers, but that is not enough, see Transamerica Premier Ins. Co. v. Ober, 107 ___ _____________________________ ____ F.3d 925, 933 (1st Cir. 1997), and the transcript refutes their claim that they renewed their broad objection after the jury was instructed. If we could rescue this verdict by resort to Rule 51, we would readily do so: it is counsel's obligation to comply strictly with Rule 51, especially so in a long and complex civil proceeding. Yet, for other reasons this case must go back for a new trial, and it is unfair to leave the district -11- -11- court in the dark on the true issue--namely, whether under the Blue Sky statute, one or more of the traditional common law theories of third-party liability can be used to supplement the statutory vicarious liability provision. Unfortunately, this is an exceedingly difficult question to which no certain answer can be returned. In construing the Securities Exchange Act, this court concluded that the statutory section imposing vicarious liability (section 20, 15 U.S.C. 78t(a)) did not foreclose alternative common-law avenues. In re Atlantic Financial _____ __________________ Management, Inc., 784 F.2d 29, 35 (1st Cir. 1986), cert. _________________ _____ denied, 481 U.S. 1072 (1987). But in Central Bank, the ______ _____________ Supreme Court more recently said that Congress' choice in section 20 "to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere," 114 S. Ct. at 1452, casting some doubt on Atlantic Financial. See id. at 1460 ___________________ ___ ___ n.12 (Stevens, J., dissenting). But see Seolas v. Bilzerian, _______ ______ _________ 951 F. Supp. 978, 984 (D. Utah 1997). In any event, federal case law is only suggestive as to how the state statute should be construed, and the New Hampshire statute differs from federal securities law by, among other differences, providing that it "does not create any cause of action not specified in this section." N.H. Rev. Stat. Ann. 421-B:25(XI). This language, together with -12- -12- Central Bank's general reasoning, suggests that the New _____________ Hampshire statute has developed a self-contained regime for third-party liability, displacing common law theories. Other courts, construing state versions of the Uniform Securities Act akin to New Hampshire's statute, appear to have taken this view. Connecticut Nat'l Bank v. Giacomi, 659 A.2d 1166, ______________________ _______ 1176-77 (Conn. 1995); Atlanta Skin & Cancer Clinic, P.C. v. ___________________________________ Hallmark Gen. Partners, Inc., 463 S.E.2d 600, 604-05 (S.C. _____________________________ 1995).  The district court on retrial is free to reach a different conclusion. Obviously it should do so if in the meantime the New Hampshire Supreme Court so instructs in another case; and it may do so if it is persuaded differently by the parties on remand, since the parties here have scarcely addressed the pertinent statutory provisions. But defendants' past failure to comply with Rule 51 does not justify perpetuating possible error where a new trial is necessary in any event. This brings us to a set of objections that the defendants clearly did renew after the jury instructions had been given: that the evidence did not support instructions on either a partnership or civil conspiracy theory. The defendants do not dispute that such bases of liability are legally available for common law fraud, and (as noted) they have forfeited the objection on this go-around as to the Blue -13- -13- Sky claim. But the issue here is different: the defendants objected that the instructions were improper in this case for ____________ lack of evidence as to partnership and conspiracy. Normally, it is error--although not necessarily prejudicial error--to instruct on an independent theory of liability where the evidence is inadequate to permit a reasonable jury to find the facts necessary to make out the theory. E.g., Sexton v. Gulf Oil Corp., 809 F.2d 167, 169 ____ ______ ______________ (1st Cir. 1987). Here, over explicit objection, the district court gave substantial and independent instructions as to partnership and civil conspiracy, placing these separate bases of vicarious liability squarely before the jury. It is a closer question whether this issue, timely raised in the district court, has been adequately preserved on appeal, for the defendants challenge the evidence but do not focus upon the instructions. We think that, just barely, the propriety of the instructions is impugned by the defendants' detailed argument that the evidence failed to support vicarious liability. This attack in turn has provoked a response from plaintiffs that allows us to see what record evidence they think supports such liability. We conclude that the partnership instruction cannot be justified in this case and that its inclusion may well have misled the jury. What the district court said on this issue is as follows: -14- -14- The plaintiffs here also contend that the nature of the relationship among the various defendants was that of a partnership, and in that respect you are instructed that when two or more persons join in a business enterprise or some activity with a common purpose and each has a right to control or manage, then each is liable for any legal fault of the others committed within the scope of the enterprise. Every partner is an agent of the partnership for the purposes of the business, and the act of every partner including the execution and the partnership name of any instrument or apparently carrying on in the usual way the business of the partnership of which he or she is a member binds the partnership unless the partner so acting has in fact no authority to act for the partnership in the particular manner and the person with whom he is dealing has knowledge of the fact that he has no authority. The difficulty is that there was no evidence of a partnership among the defendants. There are corporations and their officers, employees and agents--but nowhere is there a partnership visible on the defense side. We are talking here, it should be remembered, not about a colloquial usage of the term "partner" but about a legal relationship that __________________ broadly imposes liability without fault upon otherwise innocent parties. H. Reuschlein & W. Gregory, The Law of ___________ Agency and Partnership 203, at 306-10 (2d ed. 1990). ______________________ The individual defendants did not even arguably fit in this discrete business category. Perhaps the nearest possibility is to call the venture among the corporate owners -15- -15- of MMI a partnership; but shareholders of a closely held company are not ipso facto partners, nor can they normally be __________ treated as partners simply because they join to sell their shares to a single purchaser. Otherwise, we would undo the ordinary protections of corporate form in many close corporations. Cf. Terren v. Butler, 597 A.2d 69, 72-73 (N.H. ___ ______ ______ 1991). The partner-liability instruction given here effectively invited the jury to find a partnership somewhere in this case based on a brief but broad definition ("business enterprise or some activity with a common purpose" plus joint control). A jury, uncertain about the proof on conspiracy or agency, could easily have thought that the mere association of the defendants in seeking to sell MMI made each liable for whatever the others did in connection with the sale. That is not the law. Frequently, in civil jury cases with multiple theories, judges use special verdicts or interrogatories to isolate potential problems. See Fed. R. Civ. P. 49. Here, for ___ example, the district court could have asked the jury to say, as to each defendant and each of the two claims, whether it based liability on direct participation, agency, partnership or conspiracy. But the court asked only for separate verdicts against each defendant on the common law and statutory claims. Thus, on each count, liability could -16- -16- easily have been based on partnership--the vicarious liability theory, at least as defined, with the fewest strings attached. Assessing the risk of prejudice from an uncalled-for instruction is no easy matter. If the evidence were overwhelming on alternative theories, we might well treat as harmless an error whose inherent tendency is to cure itself. Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage, ________________________ _______________________________ 950 F.2d 60, 69 (1st Cir. 1991). But the breadth of the partnership instruction dampened this tendency; and, as will become clear, vicarious liability on other theories is at best a close call. We are also doubtful whether there was an adequate evidentiary basis for instructing on civil conspiracy, although this is a closer question. To oversimplify slightly, the civil conspiracy charge required proof that two or more of the individuals on the defense side had agreed to the use of lies or culpable omissions about MMI's post-sale prospects. Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d _____________________ ____________ 1546, 1564 (1st Cir. 1994); Ferguson v. Omnimedia, Inc., 469 ________ _______________ F.2d 194, 197 (1st Cir. 1972).4 The companies, of course,  ____________________ 4Civil conspiracy can be used to impose vicarious liability in a fraud case. E.g., Aetna, 43 F.3d at 1564-65. ____ _____ As already noted, it is not clear that it is available under the Blue Sky statute, although the "aiding" provision of that statute may create an overlapping basis for liability. -17- -17- could also be conspirators, but only if individuals acting for the companies made such agreements. No direct proof of such an agreement was offered, but in conspiracy cases proof by inference is common, and such proof may suggest either that there was a formal (but concealed) agreement or that there was a working understanding that amounted to an implicit agreement. See United States v. ___ ______________ Moran, 984 F.2d 1299, 1303 (1st Cir. 1993). In certain _____ situations, circumstantial proof to this end may be compelling: if a gang of drug dealers were caught in the middle of a sale, it would be a very small step to infer a prior agreement. Here, however, the central activity--the sale of MMI-- was entirely lawful and of necessity involved some consultation among the owners. The limited misrepresentations alleged to have occurred were sporadic, oral comments of a few individuals (Hill, Gunner, Axelrod, and Levy). Each one had independent reasons to make the sale succeed and, assuming the plaintiffs' version of events, each made varying statements that a jury could find to be culpable. To infer an agreement to lie or conceal is another _________ matter entirely. We need not resolve the issue since a retrial is needed on account of the partnership instruction. The conspiracy issue has not been thoroughly briefed, the evidence on -18- -18- retrial may vary, and courts have sometimes been generous in allowing the jury to infer agreement even where criminal conspiracy is not involved. If the trial court does allow the conspiracy charge to reach the jury, it might wish to ask a separate question on this issue, and perhaps on other theories of primary and vicarious liability as well. See 9A ___ C. Wright & A. Miller, Federal Practice and Procedure: Civil ______________________________________ 2d 2505, at 166-67 (1995). __ III. Apart from their new trial claims, the defendants argue that they are entitled to outright dismissal because the plaintiffs failed to produce sufficient evidence to sustain any valid theory of liability. This claim was properly ___ preserved in the district court and we review de novo the _______ denial of motions for judgment as a matter of law. Ansin, _____ 105 F.3d at 753. We reverse a denial only if "reasonable persons could not have reached the conclusion that the jury embraced." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 716 _______ ___________________ (1st Cir. 1994). On this record, the jury could have concluded--although just barely--that Gunner and Axelrod were liable for their own misrepresentations. As already noted, Weingart testified that, during a conference call in January 1988, Gunner and Axelrod "confirmed" that the sale of MMI "had nothing to do with the Sears contract business" and that MMI's business -19- -19- with Sears would continue as usual. And, at a meeting on May 19, 1988, Gunner and Axelrod said that "as far as they knew Sears would be there in the future." It was Hill who made the more specific misstatements already described, saying several times in the presence of Gunner and perhaps Axelrod that MMI's business with Sears would almost certainly continue unchanged or increase. Absent conspiracy, the latter two are perhaps not directly accountable for the former's misstatements. But it may be that the milder statements of Axelrod and Gunner were made even more misleading in the context of Hill's statements. Axelrod did warn the plaintiffs against buying MMI, but the jury could have regarded a generic warning as insufficient to overcome misrepresentations. Since Sears provided a large proportion of MMI's business, these statements were plainly material. And there was evidence, albeit disputable, that could have persuaded the jury that Gunner and Axelrod knew that these statements were false or misleading at the time they were made, thus satisfying the scienter element for common law fraud. As for the Blue Sky law, it appears likely that mere negligence is enough. See Sprangers v. Interactive Tech., Inc., 394 N.W.2d ___ _________ _______________________ 498, 503 (Minn. Ct. App. 1986). The evidence of knowledge was indirect, resting on two linked premises: that the Sears members of MMI's board knew -20- -20- about the probable withdrawal of Sears' business and that they conveyed this information to the full board, including Gunner and Axelrod. Susann Mayo, a Sears distribution manager, gave deposition testimony on both points; and Novotny testified that in February 1987, he was told by another Sears employee that "nobody in his right mind would buy [MMI] without some sort of guarantee that Sears business will continue," and also testified about his general practice of providing information to MMI's board of directors. The common law claim required "clear and convincing proof" of fraud, reflecting at least a "conscious indifference to [the] truth." Brochu v. Ortho Pharm. Corp., ______ __________________ 642 F.2d 652, 662 (1st Cir. 1981). But if Mayo's testimony were credited and indirectly confirmed by Novotny, the jury could find clear and convincing proof that Gunner and Axelrod knew that Sears business with MMI was likely to decline and that the sale of MMI was prompted by this concern. The case is not overwhelming, but was sufficient to get to the jury based on actual knowledge. We reject, however, plaintiffs' attempt to impute all of Sears' knowledge to the other defendants on a partnership theory. The final fact at issue is reasonable reliance by the buyers, a familiar element for the common law claim, Gray, ____ 640 A.2d at 279, and perhaps, but less clearly so, for the Blue Sky claim. Compare Gohler, IRA v. Wood, 919 P.2d 561, _______ ___________ ____ -21- -21- 566 (Utah 1996) (reliance not required under the Uniform Securities Act). There is no rigid rule on what makes reliance reasonable; courts, including this one, have resorted to checklists of factors. Kennedy v. Josephthal & _______ ____________ Co., 814 F.2d 798, 804 (1st Cir. 1987). ___ Here, it is a close question whether reliance was reasonable. Dinco and Weingart knew a good deal about MMI's business and also that one of the Sears departments was discontinuing business with MMI. Their repeated efforts to secure a guarantee of continued Sears business show that they were well aware of the danger. There was testimony, which the jury may not have credited, that Novotny warned them that MMI could not rely upon continued business with Sears, and Axelrod also gave a more general warning. At the same time, the jury could have found that Axelrod and Gunner knew that continued Sears business was not only uncertain but unlikely. And, taking the disputed facts favorably to the verdict, both defendants had specific information as to why it was unlikely--information that was not available to the buyers, whatever their general knowledge about MMI's business. The jury was thus permitted, although certainly not required, to find reasonable reliance. This brings us to the responsibility of the corporate defendants, perhaps the most difficult issue in the case. Partly this is so because the law on this issue is complex -22- -22- (and differs as between the common law fraud and the Blue Sky claims) and partly because of the entangled relationships between the individuals and the companies. Let us start with a few basics, beginning with ordinary rules of agency that unquestionably apply to the common law fraud claim. A principal is liable for actually authorized wrongs, but there was no proof that any of the charged misstatements was directly authorized by anyone. Indeed, in his charge the district court instead emphasized apparent authority and respondeat superior liability; as to the latter, he said that a company is liable for acts of an employee or agent "acting within the scope of his employment." The defendants do not dispute that the agency rules were correctly stated. See ___ Atlantic Financial, 784 F.2d at 31-32. __________________ Given these rules, we think that the evidence permitted the jury to impose liability both on Ontario and upon Dylex and its Nederland subsidiary.5 Gunner and Axelrod both worked for Dylex and were themselves the owners (with Levy) and chief officers of Ontario. Even if Hill were taken as primarily representing Sears, Axelrod and Gunner (together  ____________________ 5As noted earlier, Dylex owned Nederland, Nederland owned Dylex's MMI stock, and Gunner and Axelrod worked for an unincorporated division of Dylex. Perhaps because of this intertwining, the defendants' brief has made no effort to distinguish the respective roles of Dylex and Nederland, and we pass over this possibility. -23- -23- with Levy) were the only direct links between the buyers and the corporate defendants other than Sears. Indeed, both Axelrod and Gunner received compensation only from Dylex, even though they also served as officers and directors of MMI; and their May 19, 1988 meeting with the plaintiffs about the prospective sale, during which Axelrod and Gunner made misleading statements, took place at Dylex's offices in Montreal. In the context of the sale, Axelrod and Gunner could be treated without difficulty as agents or apparent agents both of Dylex and Ontario for purposes of making the sale. Cf. Restatement (Second) of Agency  ___ ________________________________ 14L(1), 226 (1958). Turning to the Blue Sky claim, that statute imposes vicarious liability on every person who "directly or indirectly controls a person" who has direct liability. N.H. Rev. Stat. Ann. 421-B:25(III). And, as noted, Gunner and Axelrod were employees of Dylex and owners and officers of Ontario. This is enough to make a prima facie case that the ___________ corporate defendants were "controlling persons." See SEC v. ___ ___ First Sec. Co. of Chicago, 463 F.2d 981, 987-88 (7th Cir.), __________________________ cert. denied, 409 U.S. 880 (1972). ____________ A controlling person may defeat liability if it proves that it did not know, and despite reasonable care could not have known, the true facts. Id. 421-B:25(IV). But Ontario ___ could hardly make such a showing since Gunner and Axelrod -24- -24- were its chief officers; and, as Axelrod was a director of Dylex, his knowledge about Sears' prospects could be imputed to Dylex. See Sutton Mut. Ins. Co. v. Notre Dame Arena, ___ _____________________ __________________ Inc., 237 A.2d 676, 679 (N.H. 1968). Nederland alone might ____ dispute controlling person liability, but has not sought to distinguish itself from Dylex. Thus, the defendants are not entitled to judgment as a matter of law on the common law or Blue Sky claims. -25- -25- IV. The defendants have made numerous claims of trial error under five additional heads. The claims relate, primarily, to plaintiffs' expert testimony on corporate practice, to the admission or exclusion of specific documents and statements, and to damages. Most of the issues do not involve abstract legal rulings but judgments about the permissible uses of certain evidence, the soundness of premises used by the experts, and how damage issues in this case should be structured for the jury. Many of the issues may not arise in the same form on retrial or the trial judge may treat them differently. We are unwilling to go very far in tying the hands of the trial judge on matters where on-the-spot judgments are crucial, discretion is substantial, and more than one alternative is often permitted. But this is a case that patently should be settled, as we told the parties at oral argument, and it may assist the parties for us to make three general comments about certain of the defendants' claims of error. First, the defendants sought to exclude as hearsay- within-hearsay Sears documents that cast a pessimistic light on Sears' internal plans for MMI's future. The district court disagreed and admitted the documents alternatively as admissions by an agent or servant, Fed. R. Evid. 801(d)(2)(D), or as admissions by a co-conspirator, id. ___ -26- -26- 801(d)(2)(E). Proof of conspiracy was meager, and we have even more difficulty seeing how in preparing these documents the Sears authors (such as Mayo and Novotny) served as agents or employees of any of the remaining non-Sears defendants. Nonetheless, the defendants ought to appreciate that many of the Sears documents might be admissible to show the state of knowledge of Sears' representatives on the MMI board. To the extent that other evidence indicates that Sears' plans were conveyed to MMI's other directors, this could affect the knowledge of other defendants. We do not purport to rule on particular documents but think that the defendants should be aware of this logic in assessing their position. Second, the defendants complain that Mark McKinsey, a plaintiffs' expert who testified on corporate practice, should not have been allowed to testify and, in any event, went too far in telling the jury how to decide contested issues. As to the expert's qualifications, close cases are largely for the district court. Espeaignnette v. Gene _____________ ____ Tierney Co., 43 F.3d 1, 11 (1st Cir. 1994). Given what we ___________ currently know of defendants' objections, we would be unlikely to reverse the district court if it deemed this expert qualified and left weight to the jury. But we have little doubt that a tighter rein should be kept on this expert if another trial proves necessary. It is -27- -27- one thing to testify about ordinary corporate practice; it is quite another for the expert to tell the jury at length that the plaintiffs reasonably relied upon specific statements made to them. Yes, the bar on "ultimate issue" opinions has been abolished in civil cases, Fed. R. Evid. 704(a); but that is not a carte blanche for experts to substitute their views _____________ for matters well within the ken of the jury. See United ___ ______ States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994). ______ ______ Third, the jury awarded plaintiffs $2,908,500, almost $1 million more than the price that they paid for MMI; and their expert--who sponsored an even larger figure--explicitly based his calculations of lost profits by projecting 20 years of continued Sears business for MMI. Even under a "benefit of the bargain" theory, Wilson v. Came, 366 A.2d 474, 475 (N.H. ______ ____ 1976), it seems to us that no purchaser could reasonably take the assurances provided by any defendant as a guarantee that Sears business would continue unabated for 20 years. There is no need for us to address another concern about this damage award--importantly, the risk that double recovery may have occurred; this is a matter that can be guarded against on retrial through the use of instructions and verdict forms, now that the problem is fully in focus. Whether any award based on future profits is too speculative, ___ cf. Hydraform Prod. Corp. v. American Steel & Aluminum Corp., ___ _____________________ _______________________________ 498 A.2d 339, 345 (N.H. 1985), is an issue we do not decide. -28- -28- To conclude, the plaintiffs have a potential, but hardly certain, case against the defendants. The defendants have to consider the Sears documents and jury sympathy; the plaintiffs, the risk of recovering nothing and some limits on just how ambitious a recovery could be sustained. Now that the appeal is resolved and both sides face the expense of a retrial, counsel owe it to their clients to renew discussions. The judgment is vacated and the case is remanded for a _______ ________ new trial consistent with this decision. -29- -29- APPENDIX APPENDIX This appendix contains pertinent provisions of the Uniform Securities Act, N.H. Rev. Stat. Ann. 421-B:1 et __ seq.  ____  421-B:3. Sales and Purchases 421-B:3. Sales and Purchases It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:  I. To employ any device, scheme, or artifice to defraud; II. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or  III. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 421-B:2. Definitions 421-B:2. Definitions * * * * * XVI. "Person" means an individual, corporation, partnership, association, joint stock company, trust where the interests of the beneficiaries are evidenced by a security, unincorporated organization, a government, political subdivision of a government, or any other entity. * * * * * 421-B:25. Civil Liabilities 421-B:25. Civil Liabilities * * * * * II. Any person who violates RSA 421-B:3 in connection with the purchase or sale of any security shall be liable to any person damaged by the violation of that section who sold such security to him or to whom he sold such security . . . . Damages in an action pursuant to this paragraph shall include the actual damages sustained plus interest from the date of payment or sale, costs, and reasonable attorney's fees.  III. Every person who directly or indirectly controls a person liable under paragraph I or II, every partner, principal executive officer, or director of such person, every person occupying a similar status or performing a similar function, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the acts or transactions constituting the violation, are also liable jointly and severally with and to the same extent as such person. There is contribution as in cases of contract among the several persons so liable.  IV. No person shall be liable under paragraphs I and III who shall sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.  * * * * * XI. The rights and remedies promulgated by this chapter are in addition to any other right or remedy that may exist at law or in equity, but this chapter does not create any cause of action not specified in this section or RSA 421-B:8, V. . . .  421-B:32. Statutory Policy 421-B:32. Statutory Policy This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation of this chapter with the related federal regulation. -31- -31-